UNITED STATES of America,
Plaintiff-Appellee,

v.

James R. MONACO and Eugene O. Hicks, Defendants-Appellants.

No. 80–5595.

United States Court of Appeals,
Eleventh Circuit.

March 17, 1983.

As Corrected April 6, 1983.

862

P.D. Aiken, Fort Lauderdale, Fla., for Hicks.

Mervyn Hamburg, Washington, D.C., for plaintiff-appellee.

Before FAY, ANDERSON and CLARK, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

James Ronald Monaco and Eugene O. Hicks appeal their convictions for conspiring to import marijuana into the United States in violation of 21 U.S.C.A. § 963 (West 1981) and for importation of marijuana into the United States in violation of 21 U.S.C.A. § 952(a) (West 1981). We affirm the convictions, but remand for resentencing of appellant Hicks.

### I. BACKGROUND

On October 4, 1977, appellants were indicted along with three other persons for conspiracy to import marijuana, importation of marijuana, and distribution of marijuana. After a jury trial in early 1978, Monaco, Hicks and one co-defendant were convicted on all three counts; the other two co-defendants were acquitted on all counts. Several months after the conclusion of the 1978 trial, appellants and their convicted co-defendant discovered that the government had failed to disclose certain Jencks Act material, *see* 18 U.S.C.A. § 3500 (West 1969), to the defense. They also learned that three of the government's witnesses at the first trial had violated the court's witness sequestration order. Based on these revelations, appellants and their co-defendant filed a motion for a new trial, which was granted. *See* Record on Appeal, vol. 2, at 433–36. Before the new trial began, the government dismissed the charges against the third co-defendant.

At the second trial, which also was a jury trial, appellants again were convicted of conspiracy to import marijuana and impor-

Alan E. Weinstein, Richard J. Preira, Miami Beach, Fla., for Monaco.

tation of marijuana.[1] The district court entered judgment on these convictions, and this appeal followed.

The major issues on this appeal involve the admissibility of John Steel's testimony from the first trial (Part II); the admissibility of certain hearsay declarations of Joseph Nadaline as related by Richard Manfredi (Part III); the sufficiency of the evidence as to both appellants (Part IV); and a challenge to Hicks' sentence based on *Bifulco v. United States,* 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), and *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (Part V).

## II. ADMISSIBILITY OF PRIOR TESTIMONY OF JOHN STEEL

### A. FACTS

The government's first witness at appellants' second trial was John Steel. Although Steel had testified at appellants' first trial, he had indicated prior to the second trial that he was unwilling to testify again. *See* 1st Supp. Record on Appeal, vol.

1, at 4, 8. Nevertheless, when Steel was called to the stand he began to answer questions about his personal background and his involvement in marijuana smuggling.[2] Steel indicated that in late 1975 and early 1976 he was a major organizer in the smuggling and distribution of marijuana from South America into the United States. Specifically, Steel arranged the transportation of marijuana on large ocean-going vessels and the offloading of marijuana onto smaller boats to bring the drugs ashore. One of the vessels under Steel's supervision at this time was the CINA IV or GINA IV.[3] Steel testified that in mid-February of 1976, this vessel was bringing a load of marijuana from Columbia to an offloading point somewhere near the Bahamas.

After eliciting these facts from Steel, the prosecutor began a line of questions designed to tie appellants to Steel's smuggling activities. However, Steel refused to testify any further. Record on Appeal, vol. 9, at 43–44; *id.,* vol. 10, at 37–39. At first, Steel stated that he would not testify because he feared reprisals in jail.[4] A public defender

---

**1.** As noted above, both Monaco and Hicks also had been indicted for distribution of marijuana in violation of 21 U.S.C.A. § 841(a)(1) (West 1981). In response to a motion for judgment of acquittal at the close of the prosecution's case in the second trial, the government conceded that it had failed to carry its burden of proof on the distribution count. Consequently, the district court entered judgment of acquittal on that charge. Record on Appeal, vol. 14, at 154.

**2.** Steel testified that he had been an attorney and also had engaged in politics, serving as the mayor of Hallandale, Florida, and conducting an unsuccessful campaign for Congress. In 1967, however, he had been disbarred as an attorney for defrauding a client of money. *See Florida Bar v. Steele,* 197 So.2d 305 (Fla.1967); *see also In re: Steele,* 283 So.2d 350, 351 (Fla. 1973) (petition for reinstatement denied). (The district court and Steel himself in this case have spelled the name without the final "e.") Thereafter, Steel became involved in the marijuana trade, working his way up from a position as a boatman (*i.e.,* a driver of small boats used to smuggle marijuana) to the top of the marijuana smuggling business. When Steel testified at the first trial, he was serving fairly substantial sentences for a variety of offenses, but these sentences were considerably less than the maximum penalties Steel could have received for his crimes. By the time of the

second trial, Steel was facing sentencing in New York on additional convictions for narcotics trafficking.

**3.** For reasons that are not clear from the record, Steel was uncertain about the correct name of this vessel. The parties have referred to the ship as the CINA IV, and henceforth so shall we.

**4.** The following exchange took place when the prosecutor began to ask Steel about the agreements for the offloading of the CINA IV:

THE WITNESS: Your honor, I think at this point I will just decline to go further with it, sir.

THE COURT: Take the jury out. [Jury not present.]

THE COURT: Alright. Now, your answer, Mr. Steel, was at this point I think I am declining to go further?

THE WITNESS: Yes, sir.

THE COURT: I am not sure I understand what that means.

THE WITNESS: Yes. It means that I won't play games with the Court. I will not commit perjury to this Court, and therefore I decline to answer, sir, and I subject myself to the will of the Court.

THE COURT: You mean you do have an answer to the question?

then was appointed to represent Steel and advised him that he had a right not to testify under the Fifth Amendment, despite the fact that the government had granted him use immunity.[5] In any event, Steel persisted in his refusal to testify even though the court ordered him to testify and held him in contempt for failing to do so.

> THE WITNESS: Yes, sir.
> THE COURT: But I am not sure that I understand what you mean when you say you will not commit perjury.
> THE WITNESS: I won't lie to the Court and say I don't remember.
> THE COURT: I understand. I appreciate that. Then what is the reason for not answering?
> THE WITNESS: I will not testify against these defendants here, sir. I have testified once in this cause, and I just think it is time to stop.
> I am very sorry for that, but that's the way I have to feel, sir.
> THE COURT: You understand, Mr. Steel, that you are being given the use of immunity? I think you understand what that means?
> THE WITNESS: Yes, sir.
> THE COURT: I will explain it again, just to make real sure. [The court then explains the immunity which had been given to Steel.]
>
> . . . . .
>
> THE WITNESS: Yes, sir. Your Honor, I will spend the rest of my life in prison. It's more deadly than the game out here is, and if I go into prison with that reputation for the rest of my life, I don't like to be beaten every week. I have my choice, your Honor, and I must elect that choice.
> I am very sorry about it. I want this Court to know that. I want this Court to know— that's all I have to say, sir.

Record on Appeal, vol. 9, at 43–46. The judge then engaged in a long discussion of the consequences of contempt with Steel. After the court emphasized to Steel that a penalty would be imposed for his refusal to testify, Steel responded as follows: "Your Honor, I will state again, sir, that I need to survive. If I am going to survive within the prison system, I have to do it my way, sir." *Id.*, vol. 9, at 51.

Subsequently, after appointing a public defender to advise Steel, the court gave Steel another chance to testify. When Steel refused, the court held Steel in contempt. The court then instructed Steel to discuss the potential penalties with his attorney and "weigh what your best interests are from a future standpoint." *Id.*, vol. 10, at 42. Steel responded: "I just say to the Court, sir, I can't weigh anything, Judge. I want to spend the rest of my life in prison, and I better do it as a human being." *Id.*

5. The public defender advised Steel to invoke his Fifth Amendment privilege against self-incrimination on the theory that truthful testimony at the second trial might contradict some of Steel's testimony at the first trial or before the grand jury, thus exposing Steel to liability for perjury. Record on Appeal, vol. 10, at 2–4, 28–32, 37–38. The following colloquy illustrates the position asserted by Steel's appointed counsel:

> THE COURT: All right. Mr. Moreno, Mr. Steel is now willing to testify?
> MR. MORENO: [Steel's attorney] No, your Honor. In addition to the reasons he has stated before, I am advising him to invoke his Fifth Amendment right to remain silent, on the grounds that the immunity provided by the government through the Court does not cover all of his Fifth Amendment rights, simply because it doesn't cover perjury, your Honor.
> And he has testified in the past at a trial, it is my understanding, and also before the Grand Jury, I believe, and he does not quite remember all the events. So thus, under cross examination—
>
> . . . . .
>
> MR. MORENO: Well, your Honor, I have advised my client to invoke the Fifth Amendment right to remain silent, simply because the Immunity Statute does not cover perjury, and anything he could say now could—even though it is his intention to be truthful—anything that he could say now could be used to contradict what he has stated before.
> THE COURT: Do you mean even though he is doing his very best to tell the truth, he could be guilty of perjury if it happened to conflict with his Grand Jury testimony?
> MR. MORENO: He could be charged with perjury, your Honor, and could be subject to a prosecution for it.
> THE COURT: That means, then, that no witness who has appeared before a Grand Jury should come to court to testify. Is that the net effect of what you are telling me?
> MR. MORENO: In this case I believe there is the possibility and the probability that some of the statements that could be elicited from the defendant [sic], could be used to contradict his prior statements, yes.

*Id.*, vol. 10, at 2–4. The district court rejected this interpretation of the scope of the use immunity, concluding that the government would not be able to use immunized second trial testimony to prove perjury in the first trial. Thus, the court ordered Steel to continue to answer questions. When Steel declined to testify any further on direct examination, the district court held him in civil contempt.

At this point in the proceedings, the government sought to read the transcript of Steel's testimony at the first trial into the record. The defense objected to the admission of this prior testimony, pointing out that Steel was one of the witnesses who had violated the court's witness sequestration order at the first trial. According to the defense, the opportunity to cross-examine Steel at the first trial had not been adequate because the sequestration violation had not been revealed until after the trial was over. In addition, the defense argued, the fact that the sequestration violation took place made Steel's first-trial testimony inherently unreliable. The district court rejected these contentions, ruling that Steel's refusal to testify rendered him unavailable within the meaning of Fed.R.Evid. 804(a)(2) and, therefore, that Steel's prior testimony was admissible as an exception to the hearsay rule under Fed.R.Evid. 804(b)(1). Consequently, the court permitted the government to read into the record the entire transcript of Steel's direct examination at the first trial.

The most important aspects of Steel's direct examination testimony from the first trial can be summarized as follows: Steel indicated that he had difficulty procuring boats to handle the offloading of 50,000 pounds of marijuana from the CINA IV in early February of 1976. Steel discussed this problem with John Boyd,[6] and Boyd stated that he knew a person who had "the ability and the boats to take the marijuana off the CINA IV." Record on Appeal, vol. 10, at 105. Subsequently, on February 10 or 12, 1976, Boyd brought appellant Monaco to a meeting at Steel's home. At the meeting, Boyd and Monaco agreed to offload the CINA IV and smuggle the marijuana into the United States. Steel gave Boyd a secret signal code and one-half of a 50-peso note that the captain of the CINA IV would use to identify the persons who had been hired to unload the marijuana. Boyd later told Steel that he had given the signal code and the half of the 50-peso note to Monaco. A day or two later, Steel's partner in Co-

lumbia informed Steel that approximately 1,200 pounds of marijuana had been removed from the CINA IV. When Steel asked Boyd to ascertain who had taken the marijuana from the CINA IV, Boyd arranged a meeting with a person named "Hickey" who supposedly was working with Monaco. Steel later identified "Hickey" as appellant Hicks. Hicks denied any responsibility for the 1,200 pounds of marijuana, but stated that he thought he knew who had taken the marijuana off the CINA IV. Steel then contacted Monaco, but Monaco also denied any knowledge of the offloading of 1,200 pounds from the CINA IV. Subsequently, however, Monaco told Steel that he would pay for 600 pounds of the marijuana. When Steel refused this offer, additional negotiations took place between the parties, and Boyd finally agreed to pay Steel for 1,000 pounds of the marijuana. No payment on this "settlement" was ever made.

After the government finished reading this direct testimony from the prior trial into the record, the district court allowed the defendants to attempt a cross-examination of Steel. Once again, Steel refused to testify about matters dealt with at the first trial. However, Steel agreed to answer questions regarding matters not covered at the first trial.

During this live cross-examination, Steel denied that he had violated the court's sequestration order during the first trial. Steel also denied that he had ever met or roomed with Lamar Fitzpatrick, one of the persons who had previously revealed that Steel had violated the sequestration order. Steel admitted that before he agreed to testify at the first trial, the government had promised to send a representative to his parole board hearing to recommend early parole. Steel also admitted that while he was still at a federal half-way house immediately after his parole hearing, he attempted to negotiate the sale of 200,000 quaaludes to a person who turned out to be an undercover narcotics agent. Throughout

---

6. Boyd was the third co-defendant who had been convicted at the first trial. As noted previously, the government dismissed the charges against Boyd before the second trial.

the cross-examination, however, Steel was hostile, evasive and contentious, repeatedly stating that he was "quitting" and that he would not testify further. Moreover, the cross-examination was interrupted by several profane outbursts by Steel in front of the jury. Eventually, in response to a proposal from the prosecutor after another outburst, the defendants agreed to conclude their cross-examination by reading into evidence the transcript of the cross-examination from the first trial. At the same time, the defendants expressly preserved their objections to the court's decision to admit any of Steel's prior testimony.

Later in the trial, the defendants called Lamar Fitzpatrick as a witness. Fitzpatrick testified that he had been Steel's roommate at the Federal Correctional Institution in Miami during the first trial. He stated that Steel had violated the court's sequestration order on numerous occasions, spending a considerable amount of time with two other witnesses in the case, Sam Sclafani and Ron Whitaker. Further, although Fitzpatrick was not privy to the substance of most of these conversations, he testified that he believed that these conversations concerned the case in which Steel and the others were witnesses. In addition, Fitzpatrick stated that on one occasion he overheard Steel ask Sclafani, "Why did you tell them that?" or something to that effect. When cross-examined on this latter allegation, Fitzpatrick stated that Steel already had finished testifying when he asked Sclafani the above question.

## B. THE HEARSAY CHALLENGE

■ Appellants' first argument on appeal is that the trial court should not have permitted the government to read Steel's testimony from the first trial into the record at the second trial. The trial court relied on two provisions of Fed.R.Evid. 804 when admitting this prior testimony, finding that Steel was unavailable under Rule 804(a)(2) [7] and that the prior testimony met the requirements of Rule 804(b)(1).[8] Appellants admit that Steel's refusal to testify at the second trial rendered him unavailable. Appellants contend, however, that Steel's prior testimony did not meet the requirements of Rule 804(b)(1) because there had not been an adequate opportunity for cross-examination at the first trial.

Appellants base their contention on the fact that Steel violated the court's sequestration order at the first trial. Appellants argue that they did not have an adequate opportunity to cross-examine Steel at the prior trial, as required by Fed.R.Evid. 804(b)(1), because they were unaware of the sequestration violation. Appellant Hicks argues, for example, that "had defense counsel known that Steel was intentionally violating the Sequestration Rule and coaching other witnesses, then that fact would obviously have been the subject of a probing cross-examination." Brief of Appellant Hicks at 22. Appellants also contend that the fact that the sequestration violation took place, coupled with their inability to cross-examine Steel about the sequestration violation, made Steel's prior testimony inherently unreliable and, therefore, inadmissible.

We recognize that appellants were unable to cross-examine Steel about the sequestration violation at the first trial. A careful examination of the record in this case, however, does not indicate that this fact deprived appellants of an adequate opportunity to develop Steel's prior testimony. Thus,

---

**7.** Fed.R.Evid. 804(a)(2) provides:

"Unavailability as a witness" includes situations in which the declarant—
(2) persists in refusing to testify concerning the subject matter of his statement despite an order of the court to do so[.]

**8.** Fed.R.Evid. 804(b)(1) provides:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1) Former testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

we cannot agree that Steel's prior testimony was inadmissible on this ground.

At the first trial, Steel was cross-examined extensively by all five of the attorneys who represented the original five defendants, including the attorneys representing appellants. These five cross-examiners spent the vast majority of their time attempting to impeach Steel's credibility. In the process, the cross-examiners elicited, inter alia, the following information: that Steel had been disbarred for forging false notes in an attempt to defraud a client; that Steel had participated in another scheme in which a couple lost a yacht and that, after the couple brought a lawsuit which resulted in a settlement, Steel failed to abide by the settlement agreement; that the referee who considered Steel's petition for reinstatement to the Florida Bar expressly found that Steel had lied when he stated that he had repaid the client he had previously defrauded; that the Florida Supreme Court had denied Steel's petition for reinstatement to the Bar; that Steel had jumped bail after being arrested in North Carolina on drug charges; that when Steel was recaptured in Florida several months later, he possessed several passports, driver's licenses from three states, three guns, including a .32 calibre automatic with an illegal silencer, and clerical clothing which Steel admitted he used to disguise himself; that Steel had pled guilty to conspiracy to import marijuana in 1976; that Steel subsequently had continued to participate extensively in narcotics smuggling; that Steel had pled guilty to another charge of conspiracy to import marijuana in 1977; that Steel was testifying under a grant of immunity; that Steel had a motion for reduction of his sentence pending in federal court and that Steel believed that the judge was waiting to learn whether Steel cooperated with the government before ruling on that motion; that the government had promised to send a representative to recommend a reduction in Steel's sentence if Steel testified; and that Steel hoped that his cooperation

with the government would benefit his son, who also was in federal prison.

Obviously, if the defense attorneys at the first trial had known that Steel was having improper conversations with two witnesses who were scheduled to testify later in the case, they could have cross-examined Steel about this violation of the court's sequestration order. However, because the sequestration violation did not relate to the substance of Steel's testimony against appellants, the only effect of such cross-examination would have been to impeach Steel's credibility. In light of the other information about Steel already elicited on cross, such impeachment would have been merely cumulative.

Appellants suggest that the sequestration violation did not relate merely to the collateral matter of credibility, but tainted the substance of Steel's prior testimony. Appellants argue, for example, that Steel conspired with two other witnesses, Sclafani and Whitaker, to fabricate or tailor his testimony. A careful review of the record, however, satisfies us that there is no evidence that the sequestration violation affected the substance of Steel's prior testimony.

At the first trial, Steel testified before either Sclafani or Whitaker was called to the stand.[9] Thus, the sequestration violation did not give Steel an opportunity to "tailor" his testimony to fit the story given by earlier witnesses or permit Steel to obtain advance knowledge of questions the defense might ask on cross-examination. Moreover, nothing else in the record suggests that the sequestration violation influenced the substance of Steel's testimony at the first trial. Appellants have not pointed out any inconsistencies between Steel's testimony and the testimony of the other witnesses at the first trial, including those witnesses who did not take part in the sequestration violation. More importantly, Steel's testimony at the first trial apparent-

---

**9.** In addition, the record suggests that most of the improper contacts between Steel and the other two witnesses, including the only conversation which Lamar Fitzpatrick actually overheard, took place after Steel had finished testifying at the first trial.

ly corresponds with a number of statements Steel made before the sequestration violation took place; the government gave appellants copies of Steel's grand jury testimony and Steel's statements to investigating officers, but appellants have not identified any variations between these pre-trial statements and Steel's testimony at the first trial. In fact, in a memorandum filed before the trial court granted the new trial, appellant Hicks admitted that Steel's grand jury testimony was consistent with his testimony at the first trial. *See* Reply of the Defendant Hicks to the Government's Response to Defendant's Motion for New Trial, Record on Appeal, vol. 2, at 412–13.

Despite the lack of any evidence suggesting that the sequestration violation affected the substance of Steel's testimony at the first trial, appellants maintain that the testimony should not have been admissible at the second trial because the trial judge had necessarily determined that there had been inadequate cross-examination and that Steel's prior testimony was unreliable when he granted their motion for a new trial. Appellant Hicks argues, for example, that "[t]he very reason for conducting a second trial was the fact that the testimony given by Steel and others at the first trial was rendered unreliable and untrustworthy by virtue of their violation of the [sequestration order]." Brief of Appellant Hicks at 20. Appellant Monaco makes the same argument, asserting that "[t]he trial court ... found that Mr. Steel's intentional 'rule' violation had a great potential for distorting the truth of Mr. Steel's answers in the prior trial." Brief of Appellant Monaco at 40. Both appellants emphasize that in granting the new trial, the trial judge stated:

Had [the sequestration] violations been disclosed at trial, the Court, at the very least, would have instructed the jury to consider that factor in determining the credibility of each of the witnesses who testified.

That prejudice can result from sequestration violations is obvious. Cross-examination of a schooled witness may be rendered virtually useless. For this court to conclude that these defendants were not in any way prejudiced by nonobservance of the "rule" would on this record be improper.

Record on Appeal, vol. 2, at 436.

Careful analysis of the context of the new trial order, however, reveals that appellants' contention is not supported by the record. The motions for a new trial focused almost exclusively on the testimony given by Sclafani at the first trial. The motions alleged that the government, in violation of the Jencks Act, had failed to give the defendants a tape recording of a conversation between Sclafani and Monaco which contradicted portions of Sclafani's testimony at trial. The motions also alleged that Sclafani's testimony had been tainted by the sequestration violation. None of the new trial motions contended that *Steel's* testimony had been tainted by the sequestration violation.[10] Thus, it is disingenuous for appellants to argue that the trial judge's statements in the new trial order indicated that Steel's testimony was tainted.

The accuracy of our reading of the record is confirmed by a motion that appellant Monaco filed in an effort to prevent Steel, Sclafani and Whitaker from testifying at

---

**10.** The "Memorandum of Facts and Law in Support of Motion for New Trial" filed by Monaco's attorney confirms that the defendants were focusing on the unreliability of Sclafani's testimony, not Steel's testimony. After reviewing some of the possible effects that the sequestration violation had on Sclafani's testimony, the Memorandum states:

Had the violation of this Court's sequestration order been known to the defense, unquestionably Motions to Strike the testimony of Sclafani would have been made. Most

probably this Court would have granted such a motion .... Had this testimony been properly stricken, can it be said beyond a reasonable doubt that the jury would have convicted the defendants on essentially the uncorroborated word of John Steel and the thoroughly impeached and destroyed testimony of Joe Nadeline [sic]?

Record on Appeal, vol. 2, at 381. The quotation virtually admits that the substance of Steel's former testimony was not tainted by the sequestration violation.

the second trial.[11] In the motion, appellant contended that it would be "virtually useless" to cross-examine the three witnesses at the second trial because of their previous violation of the sequestration order. While making that argument, however, appellant expressly admitted that Steel's prior testimony had not been significantly affected by the sequestration violation. Appellant stated:

> The facts reflect that the presently existing prejudice is not only as to Sclafani's testimony (*which would have been the case in the original trial*) but now exists as to Steele [sic] and Whitaker's testimony as well since each of the witnesses discussed the other witnesses' testimony after each of them testified. *In the first trial, the prejudice would have resulted in Sclafani's testimony primarily since he was the one who would have had the benefit of Steele's [sic] testimony.* Now, ... the prejudice flows to each of the witnesses.

Record on Appeal, vol. 2, at 506–07 (emphasis added).[12]

We conclude that the sequestration violation related only to the collateral matter of Steel's credibility and that there is no evidence that the substance of Steel's testimony at the first trial was affected. Since there was extensive and searching cross-examination at the first trial, including significant impeachment of Steel's credibility, we believe that additional cross-examination concerning the sequestration violation would have been merely cumulative.

Our conclusion that there was an adequate opportunity for cross-examination at the first trial, as required by Fed.R.Evid. 804(b)(1), is supported by precedent. Several cases have addressed factual situations very close to the instant facts and concluded that prior testimony was admissible. In both *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), and *California v. Green,* 399 U.S. 149, 165–68, 90 S.Ct. 1930, 1938–40, 26 L.Ed.2d 489 (1970), two important cases dealing with the admissibility of prior testimony under the Confrontation Clause, the Supreme Court sanctioned the use at trial of preliminary hearing testimony, at least where the prior testimony had been subject to "the equivalent of significant cross-examination." *Ohio v. Roberts,* 448 U.S. at 70, 100 S.Ct. at 2541. In so holding, the Court was aware that "a preliminary hearing is ordinarily a less searching exploration into the merits of a case." *California v. Green,* 399 U.S. at 166, 90 S.Ct. at 1939; *id.* at 195, 90 S.Ct. at 1954 (Brennan, dissenting). We conclude that the opportunity here for cross-examination of Steel at the first trial was at least as adequate as that at the preliminary hearings in *Ohio v. Roberts* and *California v. Green.*

Cases from other circuit courts of appeals also support our conclusion that Steel's prior testimony was admissible. For example, in *Thomas v. Cardwell,* 626 F.2d 1375 (9th Cir.1980), *cert. denied,* 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981), the Ninth Circuit, under circumstances strikingly similar to this case, held that an unavailable witness's prior testimony could be used at a subsequent trial even though appellant's attorney had not known that the witness was schizophrenic at the time of the prior trial. The court noted that when an alleged deficiency in prior cross-examination relates to impeachment evidence, the test is "whether the jury had sufficient information to appraise the bias, motives and credibility of the witness." 626 F.2d at 1386 n. 34. *See also United States ex. rel. Haywood v. Wolff,* 658 F.2d 455 (7th Cir.), *cert. denied,* 454 U.S. 1088, 102 S.Ct. 649, 70 L.Ed.2d 625 (1981).

---

**11.** The government did not call Sclafani as a witness at the second trial and made no attempt to introduce his prior testimony. The government did call Whitaker as a witness, but the Court, on the advice of a psychiatrist, excused Whitaker after he suffered an emotional breakdown in the courtroom.

**12.** Our reading of the record also is supported by the trial judge's ruling. When appellants argued at the second trial that the granting of their motion for a new trial constituted a finding that the opportunity to cross-examine Steel at the first trial had not been adequate, the judge stated: "No, I don't think I have ruled that. That is your interpretation of my rul[ing]." Record on Appeal, vol. 9, at 15–16.

In addition to being consistent with other prior testimony cases, our conclusion accords with the general rule that the testimony of a witness is admissible, even though the witness invoked the privilege against self-incrimination on cross-examination or the trial court unduly restricted cross-examination, so long as "the cross-examination went only to collateral matters which bear on the credibility of the witness." *Coil v. United States,* 343 F.2d 573 (8th Cir.), *cert. denied,* 382 U.S. 821, 86 S.Ct. 48, 15 L.Ed.2d 67 (1965). *See, e.g., United States v. Phillips,* 664 F.2d 971, 1028 (5th Cir.1981) (noting that trial court's refusal to strike direct testimony when witness refuses to answer questions on cross "is not erroneous if the responses elicited would have been mere cumulative evidence concerning the witness' credibility"), *cert. denied,* 457 U.S. 1354, 102 S.Ct. 2965, 73 L.Ed.2d 1354, —— U.S. ——, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982); *United States v. Diecidue,* 603 F.2d 535, 551–52 (5th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 & 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); *Fountain v. United States,* 384 F.2d 624, 628 (5th Cir.1967) (direct testimony must be struck only if defendant's inability to cross "created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness' direct testimony;" a "distinction is generally drawn between invoking the privilege as to 'collateral matters,' not requiring the striking of direct testimony, and invoking it as to 'direct' matters"), *cert. denied,* 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968); *Smith v. United States,* 331 F.2d 265 (8th Cir.), *cert. denied,* 379 U.S. 824, 85 S.Ct. 49, 13 L.Ed.2d 34 (1964).

■ Our conclusion also is consistent with the general rule that a witness's violation of a sequestration order does not automatically require exclusion of that witness's testimony. *Holder v. United States,* 150 U.S. 91, 92, 14 S.Ct. 10, 11, 37 L.Ed. 1010 (1893); *United States v. Warren,* 578 F.2d 1058, 1076 (5th Cir.1978), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). "Failure of a witness to comply with the sequestration rule does not of itself render his testimony inadmissible, although it may affect the weight of the testimony; whether such a witness is to be permitted to testify is generally left to the sound discretion of the trial court." *United States v. Suarez,* 487 F.2d 236, 238 (5th Cir.1973), *cert. denied,* 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878 (1974). *See generally* C. Wright, Federal Practice & Procedure: Criminal 2d § 415 (1982).

Finally, we note that appellants had an adequate opportunity to inform the jury at the second trial about the violation of the sequestration order at the first trial. Although Steel refused to repeat his testimony from the first trial when he was called to the stand at the second trial, he did testify about other matters on both direct and cross-examination. Thus, appellants actually had an opportunity to cross-examine Steel regarding the sequestration violation.[13] When Steel denied that the violation had taken place,[14] appellants had an opportunity to present witnesses, and did present one witness, who contradicted Steel's statement and described the extent of the sequestration violation, thus further impeaching Steel's credibility. However, appellants did not vigorously pursue their opportunity to cross-examine Steel about the sequestration violation at the second trial. Further, the evidence that appellants introduced to demonstrate the violation to the jury (*i.e.,* through the witness Fitzpatrick) merely established that Steel had talked to other witnesses during the first trial; there was no evidence to indicate that the violation affected the substance of Steel's testimony. These aspects of the

---

**13.** Appellants also were able to further impeach Steel's credibility by questioning him about events which had taken place since the first trial, such as Steel's attempt to sell drugs to an undercover agent while he was at a federal half-way house.

**14.** Steel, unlike Sclafani and Whitaker, has consistently denied that he violated the court's sequestration order during the first trial.

second trial tend to confirm our conclusion that the inability to cross-examine Steel about the sequestration violation at the first trial did not make the prior cross-examination inadequate.[15]

■ In summary, the record does not support appellants' assertion that they had an inadequate opportunity to cross-examine Steel at the prior trial. Thus, when Steel became unavailable as a witness at the second trial, the trial judge did not err when he determined that Steel's prior testimony was admissible as an exception to the hearsay rule pursuant to Rule 804(b)(1).[16]

## C. THE CONFRONTATION CHALLENGE.

■ In addition to contending that Steel's prior testimony was inadmissible hearsay, appellants argue that the admission of Steel's prior testimony violated their right to confront the witnesses against them as required by the Sixth and Fourteenth Amendments.[17] We disagree. As the foregoing discussion of appellants' hearsay challenge demonstrates, *Ohio v. Roberts, supra,* and *California v. Green, supra,* compel the conclusion that there has been no Confrontation Clause violation in this case.

Accordingly, appellants argue, Steel's prior testimony should have been excluded because it was untrustworthy.

Assuming *arguendo* that it is appropriate to inquire into questions of particularized reliability, as opposed to questions relating to the reliability of adequately cross-examined prior testimony as a class, *but see Ohio v. Roberts,* 448 U.S. at 72–73, 100 S.Ct. at 2542, we conclude that appellants' argument is not supported by the record. In addition to being highly speculative, appellants' explanation of the reasons underlying Steel's refusal to testify ignores other portions of the record. When the judge questioned Steel about his reasons for refusing to testify, Steel, who was 55 years old and suffered from heart problems, explained that he probably would spend the rest of his life in jail and that he was afraid of reprisals if he testified against the defendants. *See* note 4 *supra.* Thus, the most likely explanation for Steel's statement about "perjury" is not that his previous testimony was false, but that he was unwilling to perjure himself at the second trial by giving false testimony that would not implicate the defendants. In fact, when the trial judge asked Steel what he meant when he said he would not commit perjury, Steel stated: "I won't lie to the Court and say I don't remember." *See* note 4 *supra.* Later, the trial judge rejected appellants' argument that Steel's refusal to testify suggested that he had perjured himself previously, stating: "I think his real concern is that he is going to be in jail a long time and that he does not want retribution." Record on Appeal, vol. 10, at 54. Accordingly, we do not believe that Steel's remarks at the second trial cast significant doubt on the reliability of Steel's prior testimony.

15. By discussing appellants' opportunity to cross-examine Steel at the second trial, we do not indicate that cross-examination of Steel at the second trial was a prerequisite to the admissibility of Steel's prior testimony; nor do we suggest that hearsay, *e.g.,* Steel's prior testimony, is admissible whenever the declarant is available to be cross-examined at trial. *Cf. Southern Stone Co. v. Singer,* 665 F.2d 698, 704–06 (5th Cir.1982) (noting that the Advisory Committee on the Federal Rules of Evidence expressly rejected the proposal that there should be an exception to the hearsay rule when the declarant is present in court and subject to cross-examination). Rather, we believe that appellants' opportunity to cross-examine and impeach Steel at the second trial is significant under the circumstances of this case because it further demonstrates that the only value such cross-examination would have had at the first trial was additional impeachment of Steel's credibility.

16. Appellants also argue that certain comments Steel made during the second trial indicated that Steel's testimony at the first trial was inherently unreliable. After Steel answered a number of questions on direct examination at the second trial, he refused to testify further and stated: "I won't play games with the Court. I will not commit perjury to this court, and therefore I will decline to answer ...." Record on Appeal, vol. 9, at 44. *See* note 4 *supra* (quoting additional statements made by Steel). Subsequently, the public defender appointed to represent Steel indicated that one of the reasons he was advising Steel not to testify was that Steel might be prosecuted for perjury if his testimony at trial was not consistent with his previous testimony before the grand jury and at the first trial. *See* note 5 *supra* (quoting a colloquy between the public defender and the trial judge). Appellants contend that Steel's statement and the public defender's comments demonstrate that Steel had perjured himself when he testified previously, but was unwilling to commit perjury again at the second trial.

17. The Sixth Amendment provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."

Moreover, in evaluating appellants' Confrontation Clause challenge, we can consider fully the fact that Steel was present at the second trial and was cross-examined with respect to the sequestration violation.[18] *California v. Green,* 399 U.S. at 153–164, 90 S.Ct. at 1932–38. Similarly, we can consider the fact that the jury at the second trial was made aware of the sequestration violation through the testimony of a witness, Fitzpatrick. These considerations add strength to our conclusion that there is no merit in appellants' Confrontation Clause challenge.

## III. ADMISSIBILITY OF STATEMENTS MADE BY JOSEPH NADALINE AS RELATED BY RICHARD MANFREDI

### A. FACTS

The government's second witness at appellants' retrial, Richard Manfredi,[19] had been a government informant at the time of the alleged conspiracy. Before Manfredi took the stand, appellants advised the trial judge that Manfredi probably would relate some statements made by Joseph Nadaline and asked the court to exclude such testimony as inadmissible hearsay, citing the rules established in *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). The government admitted that Manfredi would testify about statements made by Nadaline, but argued that the statements were admissible because the evidence demonstrated that the statements were made by a co-conspirator during the course of and in furtherance of the conspiracy. The trial judge heard some arguments on this issue, without actually conducting a hearing, but did not make an express finding at the time regarding the admissibility of the statements.

Manfredi testified as follows: Manfredi stated that Nadaline called him in late 1975 or early 1976 and asked him to locate a boat to offload marijuana. Subsequently, Manfredi talked with both Nadaline and appellant Monaco about the type of vessel needed for the offloading operation. Manfredi then contacted Ronald Whitaker, the owner of a large cabin cruiser named the DISPATCH III, and set up a meeting at a Miami restaurant attended by Whitaker, Nadaline, Monaco, Manfredi, and a fifth person unknown to Manfredi. At the meeting, Monaco and Whitaker had a brief conversation, and then all five people went to a Miami marina to inspect Whitaker's boat.[20]

A few days after this meeting, Nadaline called Manfredi and asked to see him immediately because someone had told Nadaline that Manfredi was working with the government. Manfredi met Nadaline at a prearranged location, and they proceeded to Pier 66, a combination restaurant and marina in Fort Lauderdale. A number of people, including appellants Hicks and Monaco, were present at Pier 66, and several conversations took place. First, several people talked with Manfredi about the allegation that he was working with the government. Manfredi asked to see his accuser face-to-face, but the person did not appear at Pier 66. Later, Manfredi overheard a conversation involving Hicks, Monaco and Whitaker during which Hicks offered Whitaker $200,000 "to take the boat out." Monaco and Hicks also had a conversation with

---

**18.** *Cf.* note 15 *supra* (indicating the limited manner in which Steel's presence and cross-examination at the second trial is relevant to the hearsay challenge).

**19.** We recount Manfredi's testimony in some detail. It forms the basis for the *James* findings necessary to establish the admissibility of the Nadaline hearsay, as discussed in this part. In addition, Manfredi's testimony, together with Steel's, provides the bulk of the evidence supporting the sufficiency of the evidence, as discussed in Part IV.

**20.** Agents of the Drug Enforcement Agency, acting on a tip from Manfredi, observed the meeting at the Miami restaurant and the inspection of the ship at the marina, but were unable to overhear the actual conversations. One of the agents testified at trial, corroborating certain details of Manfredi's testimony, such as the location of and participants at the meeting.

Manfredi during which they told him that he would have to go out on Whitaker's boat and offload bales of marijuana from a freighter in order to prove his innocence. Hicks added that he would give Manfredi a Rolls Royce for participating in the offloading. Finally, Monaco, Hicks, Whitaker, Manfredi and a person named "Gary" discussed a plan for sending out several vessels to participate in the offloading. According to the plan, Manfredi, Whitaker and "Gary" were to embark on the DISPATCH III and head toward a rendezvous point; the others would leave later on two smaller, faster boats, one of which matched the description of a racing boat owned by appellant Hicks, and meet the DISPATCH III at the rendezvous point.

Manfredi, Whitaker and "Gary" did set out on the DISPATCH III, but the vessel developed engine problems and had to return to another marina near Pier 66, called Harbor West. As soon as the DISPATCH III arrived at Harbor West, "Gary" made a phone call. About 20 minutes later, Monaco and Hicks arrived, examined the engine, and determined that it could not be repaired immediately. Manfredi then went home.

Later that same evening, Nadaline phoned Manfredi and told him "to come on down" because "they were ready to go out with the two smaller boats." Record on Appeal, vol. 12, at 52. However, Manfredi told Nadaline that he did not want to go out again that evening.

The following day, Nadaline phoned again and invited Manfredi to Nadaline's house. When Manfredi arrived at the house, he saw a U-Haul van which, upon examination, contained several bales of marijuana. At that time, Nadaline told Manfredi that "they indeed did go out with two smaller boats, picked up roughly 1,200 pounds of marijuana and brought it back." *Id.*, vol. 12, at 54, 178.[21]

While Manfredi was at Nadaline's house, Monaco and Hicks arrived and had a private conversation with Nadaline in the living room. After Monaco and Hicks left, Nadaline told Manfredi that the price of the marijuana had increased from $175 per pound, the price previously discussed, to $250 per pound. Nadaline also told Manfredi to take a bale of the marijuana and display it to potential customers. Manfredi did take a bale home and attempted to contact his DEA liason officer, but when he could not reach the agent immediately, Manfredi returned the bale to Nadaline, telling Nadaline that the price was too high.

Manfredi also testified that sometime in early February of 1976 he went to a meeting at Monaco's apartment. While at that meeting, Manfredi observed some nautical charts on the kitchen table. A hand-drawn overlay which had been placed on one of the charts had several markings on it, including nautical bearings of 110 or 120 degrees from the Fort Lauderdale Inlet and references to several islands. Manfredi reported this information to his DEA liason officer.[22]

After Manfredi testified, the government called Joseph Nadaline as a witness. At the first trial, Nadaline's testimony had been consistent with Manfredi's. At the second trial, however, Nadaline repudiated most of

---

**21.** At trial, Manfredi displayed some uncertainty about the exact time that Nadaline made the quoted statement. On direct examination, Manfredi testified that Nadaline had made the statement during the phone conversation in which Nadaline invited him to come to Nadaline's house. On cross-examination, however, after the defense "refreshed" Manfredi's memory with his testimony from the first trial, Manfredi admitted that Nadaline had not told him about the marijuana during the phone conversation. On redirect, Manfredi explained that Nadaline had not made the statement during the phone conversation, but had made the

statement shortly after Manfredi arrived at Nadaline's house.

**22.** A DEA agent subsequently testified that, using the information supplied by Manfredi, he flew to the area designated by the markings on the charts in Monaco's apartment. The agent sighted a single vessel in the area, a flagless shrimp boat without fishing equipment bearing the name CINA IV. The boat was heading in an easterly direction, away from the United States. This sighting was made on February 20, 1976, several days after the alleged importation.

his prior testimony, claiming that he had lied at the first trial when he implicated Monaco and Hicks. Nadaline admitted that he had contacted Manfredi about finding a boat for Monaco and had been present at several meetings during which Monaco discussed the DISPATCH III with Whitaker, but he insisted that Monaco was merely looking for a boat for fishing and that Hicks had not been present at any of the meetings. Nadaline also admitted that he had been in possession of numerous marijuana bales on the day Manfredi came to his house, but contended that this marijuana had come from a transaction which had nothing to do with appellants Monaco and Hicks.

The government, which apparently had been surprised by Nadaline's repudiation of his testimony at the first trial, used the former testimony to impeach Nadaline.[23] However, because the prosecutor did not recognize that Nadaline's prior inconsistent statements, given under oath at the first trial, were admissible as substantive evidence under Fed.R.Evid. 801(d)(1)(A),[24] the government introduced the former testimony only for the limited purpose of impeachment and not as substantive evidence.

After Nadaline finished testifying, appellants again moved to exclude the statements that Manfredi had attributed to Nadaline, arguing that the *James* test had not been met because, after the change in Nadaline's testimony, there was no proof, independent of the extrajudicial statements themselves, that Nadaline was a member of the conspiracy. After considerable discussion, the court denied the motion.[25]

Appellants did not expressly renew their motion for a *James* ruling at the close of the trial.[26] Later, at the conference on jury instructions, Monaco's attorney asked the judge whether the jury would be instructed that only acts and declarations of a co-conspirator committed in furtherance of the conspiracy were admissible against the de-

---

**23.** At the first trial, Nadaline had testified that Monaco had called him about going out on a boat to offload marijuana; that he was to receive $5,000 for participating in the offloading; that he, Monaco and a person named "Ronnie" went out to sea on a boat in mid-February of 1976; that they rendezvoused with two other boats, one of which was Hicks' boat, the KING OF DIAMONDS; that Hicks was on his boat at that time; that they proceeded to a meeting with a shrimp boat which was named CINA or GINA; that Monaco and Hicks engaged in some conversations with the captain of the shrimp boat regarding a password and the matching up of a piece of currency; that a small boatload of marijuana was taken to Hicks' partially completed house in Hallandale, which was next to the water; that Nadaline guarded the marijuana while Monaco and Hicks obtained a U-Haul truck; that Nadaline loaded the marijuana into the truck and drove it to the house that he had in Hollywood; that Monaco brought a scale to the house and then Monaco, Hicks and Nadaline weighed the marijuana; that Monaco and Hicks later told Nadaline to sell the marijuana for $250 per pound; that Nadaline sold the marijuana, receiving between $100,000 and $150,000; that he turned this money over to Monaco; that he netted about $8,000 for his participation in the transaction. Record on Appeal, vol. 13, at 49–78.

**24.** Fed.R.Evid. 801 provides in relevant part:
(d) STATEMENTS WHICH ARE NOT HEARSAY. A statement is not hearsay if—

(1) Prior Statement By Witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with his testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding . . . .

**25.** In the process of denying the motion, the court stated:
On that motion, gentlemen, I am going to deny the motion. I think it is a jury issue, as to whether or not there is substantial evidence of his complicity in the conspiracy.
. . . .
I think it ultimately becomes a jury issue, unless the evidence is such that I should not permit it to go to the jury. They, at some point, under appropriate instruction, will have to decide whether or not one is a member of a conspiracy, and thus reject his testimony or accept it, as they see fit. I think there is enough testimony in this record to permit them to do either: accept it or reject it. But I think it is a question for the jury.
Record on Appeal, vol. 13, at 107–08.

**26.** Appellant Hicks' attorney did "re-assert" all motions for mistrial and for judgment of acquittal made during the trial, "alleging the arguments and reasons advanced on each particular occasion." *Id.,* vol. 15, at 139–40. The court denied these motions.

fendants.[27] The trial judge responded affirmatively, and referred appellants to the relevant portion of the charge which, in accord with pre-*James* law, allowed the jury to determine the admissibility of statements made by alleged co-conspirators. Record on Appeal, vol. 16, at 8. The judge subsequently gave this instruction to the jury without any objection from appellants.[28]

### B. THE *JAMES* CHALLENGE

 Extrajudicial statements made by one member of a conspiracy in the course of and in furtherance of the conspiracy are admissible in evidence against other members of the conspiracy. *See* Fed.R.Evid. 801(d)(2)(E). Under the rules established in *United States v. James, supra,* the trial judge is responsible for determining whether an extrajudicial statement meets the requirements of Rule 801(d)(2)(E). 590 F.2d at 577–80. Thus, before such a statement is made known to the jury, the trial judge should determine that there is substantial evidence, independent of the extrajudicial statements, "that (1) a conspiracy existed, (2) that the co-conspirator and the defendant against whom the statement is to be offered were members of the conspiracy, and (3) that the statement was made during the course and in furtherance of the conspiracy[.]" *United States v. Alvarez,* 696 F.2d 1307, 1310 (5th Cir.1983); *United*

*States v. James,* 590 F.2d at 580–81. In addition, on appropriate motion at the conclusion of all the evidence, the trial judge should reconsider his initial *James* ruling and decide whether the prosecution has established the three facts listed above by a preponderance of the independent evidence. *United States v. Alvarez,* at 1310; *United States v. James,* 590 F.2d at 582–83.

Appellants contend that the trial judge did not make the necessary *James* findings in this case, erroneously allowing the jury to decide the admissibility issue. Further, appellants contend that they were prejudiced by this alleged failure to make *James* findings because the government had not satisfied the second and third prongs of *James.* Specifically, appellants argue that the second prong of *James* was not satisfied because there was no independent proof that Nadaline was a co-conspirator. They also argue with respect to one of the statements Manfredi attributed to Nadaline, that the third prong of *James* was not satisfied because the statements were not made during the course of and in furtherance of the conspiracy. We disagree with all three of appellants' contentions.

 Although the trial judge did not expressly determine that Nadaline's extrajudicial statements were admissible before Manfredi testified, we believe that he im-

27. The following conversation took place between the trial judge and Monaco's attorney at the charge conference:

MR. WEINSTEIN: Judge, possibly you can save me looking, if you know off the top of your head. Do you have a portion of your conspiracy charge that says that only the acts and declarations in furtherance of the conspiracy may be admitted against co-conspirators?
THE COURT: I am sure that is in there near the end.
MR. WEINSTEIN: I have just been unable to find it.
THE COURT: MH–21.
MR. WEINSTEIN: Yes, sir, I see it now.
THE COURT: Okay.
*Id.,* vol. 16, at 8.

28. The instructions provided in relevant part:
In determining whether a defendant was a member of an alleged conspiracy, however, the jury should consider only that evidence, if

any, pertaining to his own acts and statements. He is not responsible for the acts or declarations of other alleged participants until it is established beyond a reasonable doubt, first, that a conspiracy existed and, second, from the evidence of his own acts and statements, that the defendant was one of its members.
On the other hand, if and when it does appear beyond a reasonable doubt from the evidence in the case that a conspiracy did exist as charged, and that the defendant under consideration was one of its members, then the statements and acts knowingly made and done during such conspiracy and in furtherance of its· objects, by any other proven member of the conspiracy may be considered by the jury as evidence against the defendant under consideration, even though he was not present to hear the statement made or see the act done.
*Id.,* vol. 16, at 27–28.

plicitly ruled that there was substantial evidence to support the admission of the statements under *James*. Appellants had alerted the court to the possible *James* problem before Manfredi testified, and the judge, after hearing some arguments on the issue, stated that he would "try to carefully watch for it" and would "rule on it as the testimony comes in." Record on Appeal, vol. 12, at 16–17. Subsequently, during Manfredi's testimony, appellants made several objections to the admissibility of extrajudicial statements made by co-conspirators. *Id.,* vol. 12, at 28, 39–40, 53. The trial judge overruled all of these objections, and in response to one objection he stated: "I was listening carefully because of the objections that had been made, had there been any question in my mind in this case. It's obvious it would be admissible." *Id.,* vol. 12, at 40. Thus, the record indicates that the trial judge implicitly made the necessary *James* findings when he overruled appellants' objections. *Cf. United States v. Horton,* 646 F.2d 181, 186 (5th Cir.1981) ("Although the trial judge did not specifically say that there was sufficient independent evidence, it is clear that his comments during the government's case and his overruling of the defendant's various motions involving the hearsay objection, show that the trial court found there to be sufficient independent evidence of the conspiracy and that [the defendant] and [the declarant] were involved in it."), *cert. denied,* 454 U.S. 970, 102 S.Ct. 516, 70 L.Ed.2d 388 (1981) & 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982).[29]

Nevertheless, appellants contend that the court erroneously applied pre-*James* law when ruling on the admissibility of Nadaline's statements. According to appellants, certain comments the judge made during the trial, *see* note 25 *supra,* indicate that the court merely made a preliminary ruling on the admissibility of Nadaline's statements, finding that the statements could be presented to the jury because the government, as required by pre-*James* law, had presented prima facie evidence of admissibility. Subsequently, appellants argue, the court erroneously instructed the jury in accord with the pre-*James* law, submitting to the jury the question of whether Nadaline's statements were admissible under the co-conspirator rule. Thus, appellants contend that the trial court never actually determined that there was substantial evidence to support the admission of Nadaline's statements.

We admit that some of the trial judge's comments during the trial can be read to suggest that the court erroneously believed that the jury was to play a role in determining whether Nadaline's extrajudicial statements could be considered under the rule governing co-conspirator statements. Careful examination of the record as a whole, however, indicates that the trial judge recognized the proper *James* procedures and applied them in this case. In fact, immediately after the judge made the comments cited by appellants to support their argument that the court failed to follow *James,* an exchange took place between appellant Monaco's attorney, Mr. Weinstein, and the trial judge which confirms our view that the judge was applying *James* properly.

MR. WEINSTEIN: I just would refer your Honor to the last closing words on page 583 of the *James* opinion.

THE COURT: Which say?

MR. WEINSTEIN: Which seem to me to say it is not a jury issue. You have got to make specific findings, first.

---

**29.** Although the *James* opinion indicated that the preferable procedure is for the government to satisfy the three prongs of *James* prior to offering the extrajudicial statements as evidence, 590 F.2d at 581–82, this court has never mandated that procedure. Indeed, *James* and numerous subsequent decisions have indicated that the order of proof is discretionary with the trial judge and that the district court may admit statements subject to the government's

"connecting them up" with independent evidence. *Id.* at 582; *see also, e.g., United States v. Roe,* 670 F.2d 956, 962 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 126, 74 L.Ed.2d 109 (1982); *United States v. Nicoll,* 664 F.2d 1308, 1312 (5th Cir.1982) (Unit B), *cert. denied,* 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982); *United States v. Ricks,* 639 F.2d 1305, 1307–10 (5th Cir.1981) (Unit B).

THE COURT: I have got to determine whether or not there is substantial evidence of his involvement in the conspiracy.

MR. WEINSTEIN: Mr. Nadaline's?

THE COURT: Mr. Nadaline's.

MR. WEINSTEIN: Okay. Then we are in complete harmony on that.

Record on Appeal, vol. 13, at 108–09. This colloquy indicates that, despite the judge's earlier comments, the court was using the proper *James* standard of substantial evidence when ruling that Nadaline's statements were admissible.

■ The fact that the trial judge instructed the jury in accord with pre-*James* law, *see* note 28 *supra,* does not compel a different conclusion. A review of the record reveals that both the parties and the court relied heavily on the instructions from the previous trial, which took place before *James* was published, when they prepared the instructions for the second trial. Thus, the fact that the jury instructions on co-conspirator statements followed pre-*James* law was simply an oversight, to which neither appellants nor the government objected, rather than an indication that the trial judge had applied the wrong standard when ruling on the admissibility of co-conspirator statements. Certainly, appellants cannot argue that they were prejudiced by the erroneous instruction, which informed the jury that it could not consider co-conspirator statements until after it found certain facts beyond a reasonable doubt, a higher standard of proof than that required for admissibility under *James.* By giving this instruction, the judge merely gave the jury an opportunity to overturn his own ruling that Nadaline's statements were admissible against appellants. Thus, appellants were afforded even greater protection than *James* requires. *Cf. United States v. Noll,* 600 F.2d 1123, 1128 (5th Cir.1979) (no error when judge "required the Government to demonstrate twice the admissibility of the hearsay, once to the court under the *James*

panel decision and once to the jury pursuant to [*United States v.*] *Apollo,* [476 F.2d 156 (5th Cir.1973)] and thereby afforded [the defendant] even greater protection than either decision contemplated").

■ As noted previously, the court did not expressly reconsider its *James* ruling at the close of all the evidence and determine whether the government had established the three prongs of *James* by a preponderance of the evidence. However, a court need not reconsider its initial determination unless the defendants make an appropriate motion, *see United States v. Bulman,* 667 F.2d 1374, 1380 (11th Cir.1982), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982); *United States v. James,* 590 F.2d at 582, and we do not believe appellants made an appropriate motion in this case. *See* note 26 *supra.*[30] In any event, we conclude that there was ample evidence supporting the admission of the disputed statements; thus, "any error by the court [at the close of the trial] in failing to state that it found that the *James* requirements were met would be harmless." *United States v. Bulman,* 667 F.2d at 1380. *See also United States v. Alvarez,* at 1310 ("Although defense counsel did not ask the court at the close of all the evidence to reconsider its tentative decision allowing the co-conspirators' statements into evidence, we nevertheless conclude that the preponderance of the evidence established the predicate facts of the existence of the conspiracy. Therefore, the judge correctly admitted the statements of appellants' co-conspirators."); *cf. United States v. Strauss,* 678 F.2d 886 at 891 (11th Cir.1982) (although the trial judge used the wrong standard in making the *James* ruling at the close of the trial, this court made an independent review and found that a preponderance of the evidence supported the admission of the co-conspirators' statements).

---

**30.** Even if the record could be construed to suggest that appellants' general motion at the close of the evidence encompassed a request for the *James* findings, *see* note 26 *supra,* it is clear that the trial judge denied the general motion. That implicit *James* finding would not be clearly erroneous, as our discussion below demonstrates.

Obviously, if the government had introduced Nadaline's prior testimony as substantive evidence, there would have been compelling evidence of Nadaline's participation in the conspiracy. Even without considering Nadaline's prior testimony, however, we believe that there was sufficient evidence in Manfredi's testimony, independent of the disputed extrajudicial statements, to prove by a preponderance of the evidence that Nadaline was a co-conspirator. According to Manfredi's testimony: Nadaline was the person who called him in late 1975 or early 1976 and asked him to locate a boat suitable for offloading marijuana; Nadaline participated in the initial meeting between Monaco and Whitaker, and accompanied Monaco, Whitaker, Manfredi and another person on an inspection of the DISPATCH III; [31] Nadaline later called Manfredi and informed him that someone had accused Manfredi of working for the government; [32] Nadaline then directed Manfredi to a prearranged location, met Manfredi there, and took Manfredi to the meeting at Pier 66 at which Hicks offered Whitaker $200,000 for the use of the DISPATCH III, Hicks told Manfredi he would have to participate in the offloading to "prove his innocence," and the conspirators agreed on a plan to send three boats out to pick up marijuana; Nadaline invited Manfredi to his house on the day after the conspirators agreed to send boats out and showed Manfredi a vanload of marijuana; [33] Nadaline then negotiated with Manfredi about the price of the marijuana, and the price went up significantly immediately after Monaco and Hicks arrived at Nadaline's house and had a private conversation with Nadaline. When all of these factors are added together, we believe there is more than sufficient evidence to satisfy the government's burden of proving by a pre- ponderance of the evidence that Nadaline was a member of the conspiracy. *Cf. United States v. Mesa,* 660 F.2d 1070, 1074–75 (5th Cir.1981) (Unit B) (relying on similar evidence to link a defendant to a conspiracy and justify the use of co-conspirator's statements against him); *United States v. Horton,* 646 F.2d at 185 (relying on far less circumstantial evidence to prove the existence of a conspiracy for the purpose of admitting co-conspirator statements).

There also was sufficient evidence that Nadaline's statements were made during the course of and in furtherance of the conspiracy, thus satisfying the third prong of *James.* The only statement which appellants contend did not meet this requirement was Nadaline's statement that "they indeed did go out with two smaller boats, picked up roughly 1,200 pounds of marijuana and brought it back." Record on Appeal, vol. 12, at 54, 178. *See* note 21 and accompanying text *supra.* Appellants argue that this statement was made after the marijuana was imported, and thus that it could not have been made in the course of and in furtherance of the conspiracy. The record indicates, however, that the conspiracy to import had not been completed when Nadaline made the disputed statement to Manfredi. Steel testified that the conspirators were to offload 50,000 pounds of marijuana from the CINA IV. Manfredi testified that the conspirators planned to send three vessels to pick up the marijuana, the DISPATCH III and two smaller vessels, but that the DISPATCH III had engine problems and returned before reaching the CINA IV. The evidence indicates that the conspirators would not have been able to offload 50,000 pounds of marijuana onto the

---

**31.** A DEA agent confirmed that Nadaline was present at this meeting and participated in the inspection of the DISPATCH III.

**32.** If offered to prove the truth of the proposition that someone had accused Manfredi, the statement would be hearsay. However, the fact that Nadaline called Manfredi and made the statement is not hearsay, but rather is independent evidence of Nadaline's participation.

**33.** Nadaline admitted at the second trial that he had a vanload of marijuana at his house on the day in question, but stated that he had received the marijuana from a source unconnected with appellants. The government used Nadaline's prior testimony to impeach this explanation for the presence of the marijuana at Nadaline's house.

two remaining smaller vessels,[34] and thus it is clear that the conspirators had not finished offloading the CINA IV by the following morning, when Nadaline made the disputed statement to Manfredi. Moreover, the former Fifth Circuit has held in another context that importation of a controlled substance is a "continuous crime" that is not complete until the controlled substance reaches its final destination point. *See United States v. Gray*, 626 F.2d 494, 497–98 (5th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 616, 66 L.Ed.2d 500 (1980), 449 U.S. 1091, 101 S.Ct. 887, 66 L.Ed.2d 820 (1981) & 450 U.S. 919, 101 S.Ct. 1367, 67 L.Ed.2d 346 (1981). In this case, the marijuana had not reached its final destination point because the conspirators anticipated that Manfredi would be responsible, at least in part, for delivering the marijuana to buyers.[35]

We thus conclude that the Nadaline hearsay was properly admitted into evidence.

## IV. SUFFICIENCY OF THE EVIDENCE

■ Appellants' next contention is that there was insufficient evidence to convict them on Count II, importation of marijuana. In considering this claim, we must view all of the evidence, together with all logical inferences flowing from the evidence, in the light most favorable to the government, and must draw all credibility choices in favor of the finder of fact. *United States v. Gianni*, 678 F.2d 956, 958–59 (11th Cir.1982). The standard of review is whether "a reasonable trier of fact could

find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (Unit B, en banc).

Appellants' first argument regarding sufficiency is that the government failed to present sufficient evidence that the conspirators actually imported any marijuana. This argument is without merit. Manfredi testified that he saw a vanload of marijuana at Nadaline's house on the day after the conspirators met at Pier 66 and made plans to send boats out to offload marijuana from the CINA IV. Manfredi also testified that Nadaline told him, obviously in reference to the vanload of marijuana, that "they indeed did go out with two smaller boats, picked up roughly 1,200 pounds of marijuana and brought it back." [36] Record on Appeal, vol. 12, at 54, 178. This corresponded with Steel's testimony that 1,200 pounds of marijuana had been taken off the CINA IV. Thus, the evidence clearly was sufficient to allow the jury to infer that the conspirators actually imported marijuana into the United States.

■ Appellants' second argument regarding sufficiency requires more discussion. Appellants contend that there was insufficient evidence to prove that Monaco and Hicks were personally involved in the actual importation of the marijuana. Appellants emphasize that while Nadaline told Manfredi that "*they* were ready to go out with the two smaller boats" and later that "*they* indeed did go out with two smaller boats" and picked up marijuana, Nadaline

---

**34.** The evidence also indicates that appellants did not obtain another vessel to replace the DISPATCH III. After the DISPATCH III broke down and Manfredi returned home, Nadaline called Manfredi and stated that "they were ready to go out *with the two smaller boats.*" Record on Appeal, vol. 12, at 52 (emphasis added).

**35.** There is at least one other rationale supporting the admissibility of Nadaline's disputed statement pursuant to the co-conspirator rule. The record reveals that Nadaline was involved with Monaco and Hicks in an uncharged conspiracy to possess marijuana, and his statement clearly was made in the course of and in furtherance of that conspiracy. *See* S.Rep. No.

1277, 93rd Cong., 2d Sess., 26–27 (1974) (noting that although Rule 801(d)(2)(E) refers to co-conspirator statements, "the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a co-conspirator for the purposes of this rule even though no conspiracy has been charged"). *See also* J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 801(d)(2)(E)[01] (1981) (citing numerous cases for the proposition that "[t]here need not be a conspiracy count in the indictment to make [801(d)(2)(E) ] applicable").

**36.** We concluded in Part III that the Nadaline hearsay was admissible pursuant to the exception for co-conspirators' statements.

never specifically stated that the "they" referred to in the statement included Monaco and Hicks. Thus, appellants argue, there was no substantive evidence at the second trial to prove that Monaco and Hicks actually went out on the boats and brought marijuana into the United States.[37]

 Proof of personal participation in a particular substantive crime usually is not necessary when a defendant is charged with conspiracy as well as the substantive offense; the conspirator normally will be responsible for the substantive crime under the *Pinkerton* theory[38] and also may be responsible for the substantive crime under an aiding and abetting theory. In this case, however, the jury instructions did not include either a *Pinkerton* charge or an aiding and abetting charge.[39] Instead, the court merely instructed the jury that it must find that the government had established, beyond a reasonable doubt, "that the defendants imported marijuana or caused marijuana to be imported into the United States . . . ." Record on Appeal, vol. 16, at 29–30.[40] Thus, we must determine whether the evidence was sufficient to find appellants guilty of importation under this charge, without regard to the other theories which might have been charged. Nevertheless, we conclude that the evidence was sufficient for the jury to find that both appel-

37. Nadaline's testimony at the first trial placed Hicks and Monaco on the boats that offloaded marijuana from the CINA IV. However, that prior testimony was introduced at the second trial for impeachment purposes only, and therefore we cannot consider it as substantive evidence.

38. Under *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), each member of a conspiracy is criminally liable for all reasonably foreseeable crimes committed during the course and in furtherance of the conspiracy.

39. Appellants argue that the government was not entitled to either a *Pinkerton* charge or an aiding and abetting charge because, in response to a pretrial motion for a bill of particulars, the government indicated that Monaco and Hicks would be tried as principals on Count 2. Although the record is clear that the trial judge rejected appellants' bill of particulars argument and that the trial judge *intended* to give a *Pinkerton* charge, it is also clear that the usual *Pinkerton* charge was not actually given, apparently because both the government and the trial judge thought that the general conspiracy charge was the equivalent of the usual *Pinkerton* charge. In addition, the record reveals that the pattern aiding and abetting charge was not given, not because the trial judge believed it was barred by the bill of particulars, Record on Appeal, vol. 15, at 105–08, but rather because he erroneously believed it would be superfluous in light of the *Pinkerton* instruction he intended to give. Thus, since the jury instructions did not include either a *Pinkerton* charge or an aiding and abetting charge, there of course is no error, even assuming arguendo the validity of appellants' argument that the giving of either such charge would have violated the bill of particulars. Moreover, to benefit from any such variance the appellants would have to demonstrate prejudice. *See United States v. Willoz,* 449 F.2d 1321, 1323 (5th Cir.1971) (rec-

ord revealed that "the defendant was neither surprised nor prejudiced" by the "niggardly nature of the Government's answers to the bill of particulars"); *cf. United States v. Flom,* 558 F.2d 1179, 1185–86 (5th Cir.1977) (government "flagrantly departed from the unambiguous statement of the bill that no evidence of particular contracts would be offered because it had no such evidence in its possession;" later, "the prosecution sat mute while counsel for the defense made an opening statement to the jury in which he materially relied on the contents of the . . . bill of particulars, only to be confronted later with the offer and admission of the evidence over objection"). In the present case, there was no suggestion of prejudice.

40. Appellants did not object to this instruction. Thus, we need not decide to what extent, if any, the "cause to be imported" language might overlap with aiding and abetting. We decide only that the actions of Monaco and Hicks, as demonstrated in this record, were such that a reasonable jury could find beyond a reasonable doubt that each caused the marijuana to be imported. *See United States v. Ruffin,* 613 F.2d 408, 412 (2d Cir.1979) ("one who *causes* another to commit a criminal act may be found guilty as a principal") (emphasis in original); *cf. United States v. Raffone,* 693 F.2d 1343, 1346 (11th Cir.1982) (*Pinkerton* not charged, but evidence sufficient to find defendant guilty on substantive possession of marijuana count under "constructive possession" theory); *United States v. Gloria,* 494 F.2d 477, 482 (5th Cir.) (evidence sufficient to convict defendant of possession of marijuana where he "had at least constructive possession of the marijuana during the period in question because he had 'dominion and control' over [another party] who had actual possession"), *cert. denied,* 419 U.S. 995, 95 S.Ct. 306, 42 L.Ed.2d 267 (1974).

lants "imported marijuana or caused marijuana to be imported into the United States."

The evidence against appellant Monaco was as follows: Steel testified that Monaco came to his house with John Boyd to discuss the offloading of the CINA IV. Steel also testified that Boyd later told him that Boyd had given all the information necessary to complete the offloading operation to Monaco. In addition, Steel testified that while Monaco initially denied any knowledge of the actual offloading of marijuana from the CINA IV, he subsequently offered to pay Steel for 600 pounds of the marijuana. Manfredi testified that Nadaline called him and told him that Monaco needed to locate a boat for offloading. Subsequently, according to Manfredi's testimony, Monaco told Manfredi the type of vessel he needed for the offloading operation; Monaco had nautical charts and overlays in his apartment which contained sufficient information for a DEA pilot, acting on a tip from Manfredi, to locate the CINA IV; Monaco had a meeting with Whitaker to discuss using Whitaker's boat, the DISPATCH III; Monaco inspected the DISPATCH III; Monaco attended the meeting at Pier 66 and participated in the conversations in which Hicks offered Whitaker $200,000 for the use of the DISPATCH III, in which Hicks told Manfredi he would have to participate in the offloading to prove his innocence, and in which the conspirators planned the offloading operation; Monaco promptly appeared at Harbor West, apparently in response to a phone call from "Gary," after the DISPATCH III developed engine trouble and was unable to complete its offloading mission; Monaco appeared at Nadaline's house the following day and, after Monaco had a private conversation with Hicks and Nadaline, the price of the marijuana increased to $250 per pound.

It is apparent from the foregoing discussion that Steel's testimony expressly places Monaco in charge of the actual importation. Manfredi's testimony corresponds with Steel's and cites numerous specific acts by Monaco—e.g., securing the necessary boats, inspecting the DISPATCH III when its mission aborted, raising the price of the imported marijuana—which confirmed that Monaco was responsible for offloading the marijuana from the CINA IV and bringing it into southern Florida. Thus, we believe that a reasonable trier of fact could find that the evidence establishes beyond a reasonable doubt that Monaco "imported marijuana or caused the marijuana to be imported into the United States."

Similarly, we believe that there was sufficient evidence to convict Hicks on the substantive importation count. Although a review of the entire record suggests that Monaco was a notch above Hicks in the conspiracy's chain of command, there is a reasonable inference that Hicks shared responsibility with Monaco for the actual importation. Manfredi testified that Hicks articulated the $200,000 offer to Whitaker for the use of the DISPATCH III; that Hicks directed Manfredi to go out on the DISPATCH III to prove his innocence; that Hicks offered Manfredi a Rolls Royce; that Hicks appeared at Harbor West with Monaco after the DISPATCH III developed engine trouble on its way to meet the CINA IV; that Hicks also accompanied Monaco to Nadaline's house on the day after the offloading took place and participated in a private conversation which, apparently, led to an increase in the price of the marijuana. Moreover, other evidence established that Hicks owned a racing boat named THE KING OF DIAMONDS,[41] and there is a reasonable inference from Manfredi's testimony that Hicks' boat was one of the two smaller boats which did in fact go out to

**41.** Paul Haggerty, the president of Forest Marine in Miami, testified that Hicks purchased a red-sided racing boat from him in the summer of 1975 and that Hicks subsequently had a playing card, the king of diamonds, painted on the side of the boat. Record on Appeal, vol. 14, at 83–84, 86–88. In addition, Michael Jan Giannattasio, one of Monaco's neighbors, testified that early in 1976 he saw Monaco and Hicks working on two racing boats at a dock behind Monaco's house. Giannattasio testified that one of the boats was named the KING OF DIAMONDS. *Id.*, vol. 14, at 73, 75.

offload marijuana from the CINA IV and bring it back in.[42] Finally, Steel identified Hicks as the person named "Hickey" who supposedly was working with Monaco and was responsible for taking the marijuana from the CINA IV. We believe that a reasonable trier of fact could find that this evidence established beyond a reasonable doubt that Hicks "imported marijuana or caused the marijuana to be imported into the United States."

## V. SENTENCING

### A. SPECIAL PAROLE TERM ON CONSPIRACY COUNT

■ The trial court sentenced Hicks to a special parole term of four years on Count 1. Hicks contends that, under *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980), the trial court cannot impose a special parole term upon a defendant convicted of conspiracy to import marijuana into the United States. The government concedes this point. We therefore remand with instructions to vacate the special parole term imposed on the conspiracy count.

### B. INCREASED SENTENCE AFTER RETRIAL

In the first trial, Hicks was convicted on three counts, conspiracy to import marijuana into the United States, importation of marijuana, and distribution of marijuana. The court sentenced Hicks to two years of imprisonment followed by a two-year special parole term on Count 1, one year of imprisonment followed by a two-year special parole term on Count 2, and one year of imprisonment followed by a two-year special parole term on Count 3. The district court ordered these sentences to run consecutively; thus, the aggregate sentence was four years of imprisonment followed by six years of special parole terms. Subsequent-

ly, the district court granted appellants' motion for a new trial. The second trial began on the same three counts, but the district court granted appellants' motion for judgment of acquittal on Count 3 at the close of the government's case. The jury convicted Hicks on Counts 1 and 2. The district court then sentenced Hicks to four years of imprisonment followed by a four-year special parole term on Count 1 and four years of imprisonment followed by a four-year special parole term on Count 2. These sentences were to run concurrently. Hicks claims that the district court erred in imposing these sentences because they are more severe than the sentences he received at the first trial.

Due process "requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial." *North Carolina v. Pearce*, 395 U.S. 711, 725, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656 (1969). To insure the absence of vindictiveness and to assure defendants that they could appeal or collaterally attack their first convictions without fear of reprisal, the Supreme Court developed a broad prophylactic rule in *Pearce*:

[W]henever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding. And the factual data upon which the increased sentence is based must be made part of the record, so that the constitutional legitimacy of the increased sentence may be fully reviewed on appeal.

*Id.* at 726, 89 S.Ct. at 2081.

■ There are three possible reasons for declining to apply the *Pearce* rule in Hicks'

**42.** Manfredi testified that the conspirators had planned to use the DISPATCH III and two smaller boats to offload the marijuana. Although Manfredi did not actually see the two smaller boats go out, he did see two small cigarette-type racing boats at Pier 66 while the DISPATCH III was taking on fuel for its abor-

tive mission. Manfredi testified that one of these boats had a red hull with "a picture of a playing card, the king of diamonds" on it. *Id.*, vol. 12, at 46. This description matched the description of Hicks' boat given by Haggerty and Giannattasio. *See* note 41 *supra*.

case, but we find none to be persuasive. First, the government suggests that the district judge was not vindictive. We agree that the record suggests that the district judge was not vindictive in that he considered the second sentence to be equivalent in length to the first sentence.[43] However, the question whether this trial judge was in fact vindictive in this case is irrelevant to applying the *Pearce* rule. The broad prophylactic rule was developed so that a defendant could appeal or collaterally attack a conviction without any fear of reprisal. *North Carolina v. Pearce,* 395 U.S. at 725, 89 S.Ct. at 2080. We have no discretion to consider the district judge's apparent impartiality. *United States v. Floyd,* 519 F.2d 1031, 1034 (5th Cir.1975).

▮ The second possible reason for declining to apply the *Pearce* rule concerns the distinction between retrial after appeal (as in *Pearce* ) and retrial after a motion for new trial (as here). But while retrial occurred after an appeal in *Pearce,* the *Pearce* rule itself is cast in language generally forbidding increased sentencing "after a new trial." 395 U.S. at 726, 89 S.Ct. at 2081,[44] and we perceive no reason to excise Hicks' case from the compass of *Pearce.* The *Pearce* rule was created so that defendants could exercise their right of appeal without

any fear of retaliation. *Id.* at 725, 89 S.Ct. at 2080. The rationale for the rule applies with equal force to defendants considering whether to exercise their right to move for a new trial. We admit that trial judges are not inevitably vindictive after granting a new trial motion, but trial judges are not inevitably vindictive after a new trial is made necessary by a successful appeal.[45] The central question is not actual vindictiveness, but rather whether there is a realistic likelihood of vindictiveness that might deter a defendant from exercising his rights. *Blackledge v. Perry,* 417 U.S. 21, 28, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974). Thus, we decline to distinguish this case from *Pearce* simply because Hicks' new trial was granted by the district court rather than by this court on appeal.[46]

▮ The third and final possible reason for distinguishing *Pearce* concerns the question whether Hicks actually received a more severe sentence after the second trial. On that point, *Pearce* is not helpful because *Pearce* concerned an increase in overall sentence. By contrast, the aggregate sentence which Hicks received after the second trial is not greater than the aggregate sentence which he received at his first trial. Both sentences total four years, but they differ count-by-count.[47]

**43.** After the court sentenced Hicks, this exchange occurred:

> MR. GOLDMAN: ... *Your honor realizes that you have given him twice as much time this time as you did the last time.*
> THE COURT: No. That's wrong. He had four years the last time as I recall.
> MR. GOLDMAN: On three counts.
> THE COURT: On three counts.
> MR. GOLDMAN: But as to Count I the last time you sentenced him to two years.
> THE COURT: No, he had a total of four years. They were consecutive sentences, as I recall.
> In any event, Mr. Goldman, I think you will find that that is essentially the same although there is a different count involved.

Second Supp. Record on Appeal, vol. I, 32–33.

**44.** *Pearce* has been applied when a defendant was resentenced after he attacked his first conviction, not by appeal, but by a 28 U.S.C. § 2255 motion. *United States v. Markus,* 603 F.2d 409, 411 (2d Cir.1979).

**45.** We venture to say that most judges would not be vindictive in either case.

**46.** We note that Hicks had appealed his conviction after the first trial in this case, although the record had not been sent to the appellate court before the district judge granted a new trial.

**47.** Hicks argues that the sentences should be compared count-by-count. Using Hicks' method, the first sentence on Count 1 of two years' imprisonment would be compared with the present sentence of four years' imprisonment. We decline to follow Hicks' count-by-count method. An example illustrates our rationale. Suppose that, in his first trial, a defendant had been sentenced on two counts in this way: Count 1—15 years; and Count 2—25 years. These sentences were to run consecutively. Thus, the aggregate sentence was forty years. Suppose further that the convictions were reversed on appeal, that a retrial resulted in convictions again on Counts 1 and 2, and that the trial judge decided to sentence the defendant to

■■■ To calculate and compare aggregate sentences where the first sentence is vacated and the defendant is retried, reconvicted and resentenced, we follow the Second Circuit's approach in *United States v. Markus,* 603 F.2d 409, 413 (2d Cir.1979). *See also Midgett v. McClelland,* 547 F.2d 1194, 1197 (4th Cir.1977). In *Markus,* the Second Circuit disregarded the sentence on a count which the prosecution had dropped at the subsequent trial and then compared the defendant's sentence after the first and second trials. There is even greater reason to disregard the sentence attributable to Count 3 here than in *United States v. Markus, supra;* Count 3 was not merely dropped, but was dismissed for insufficiency of evidence. *Cf. Burks v. United States,* 437 U.S. 1, 15, 98 S.Ct. 2141, 2149, 57 L.Ed.2d 1 (1978) (retrial impermissible after reversal due to evidentiary insufficiency). We therefore disregard that part of the original sentence attributable to Count 3, which was dismissed at Hicks' second trial for lack of evidence. With respect to the terms of imprisonment, we exclude the one-year term of imprisonment imposed on Count 3 at the first trial. This means that the valid aggregate sentence of the first trial, three years' imprisonment, was increased to four years' imprisonment at the second trial. Because the trial judge failed to state affirmatively the reasons for the increase, this increase of one year violates the *Pearce* rule.

■■ The special parole terms are also governed by the *Pearce* rule. *See United States v. Barash,* 428 F.2d 328, 331 (2d Cir.1970), *new sentence after remand aff'd,* 434 F.2d 358 (2d Cir.1970) (per curiam), *cert. denied,* 401 U.S. 938, 91 S.Ct. 928, 28 L.Ed.2d 217 (1971). In Hicks' first sentence, a two-year special parole term was imposed as to each count running consecutively. For purposes of comparison on the special parole term, we discount Count 1's special parole term, *see* Part V.A *supra,* and Count 3's special parole term, because Count 3 was dismissed for lack of evidence. This leaves a two-year special parole term from the first trial. The increase from two to four years violates the dictates of *Pearce.*

We therefore vacate Hicks' sentence and remand for resentencing [48] in a manner consistent with *North Carolina v. Pearce, supra.*

With respect to appellant Monaco, the judgment of the district court is in all respects AFFIRMED.

·With respect to appellant Hicks, the conviction is AFFIRMED, but the sentence is VACATED AND REMANDED FOR RESENTENCING.

25 years on Count 1 and 15 years on Count 2. In other words, the judge, for whatever reason, increased the sentence on Count 1 by the same amount that he decreased the sentence on Count 2. The appearance of vindictiveness, let alone vindictiveness itself, is lacking in such circumstances. Thus, we reject the count-by-count method urged by Hicks. There is no "realistic likelihood of vindictiveness." *Blackledge v. Perry,* 417 U.S. 21, 27, 94 S.Ct. 2098, 2102, 40 L.Ed.2d 628 (1974).

**48.** *See Henderson v. United States,* 446 F.2d 557, 558 (5th Cir.1971) (per curiam).