LESLIE H. SOUTHWICK, Circuit Judge,
dissenting:
The majority has given reasonable answers to the factual and legal questions raised by this appeal. At several points, the questions are difficult ones regarding the operation of the Antiterrorism and Effective Death Penalty Act (“AEDPA”). See 28 U.S.C. § 2254(d). I answer a few of the questions differently than my colleagues, leading me to the opposite overall result.
The guard who was murdered in 1972 by someone at Angola State Prison was Brent Miller, a young man who had only recently begun work there. The viciousness of his murder cannot be overstated. My conclusion, though, is that the appellee has properly presented a significant flaw in the trial at which he was convicted. My dissent does not concern whether the appellee was guilty, but only whether defects in his trial may now be addressed in this court.
The State raised five issues on appeal. I have no disagreement with the majority on most of them. I also agree with the majority that there is no violation of the process due to Woodfox when he was retried decades after the offense occurred. Instead, I discuss only these two issues:
(1) Did the district court consider Woodfox’s claims de novo and without any deference to the state court’s rulings on them.
(2) Was there constitutionally ineffective counsel when there was no objection to reading the testimony of Hezekiah Brown to the jury; he had testified at the 1973 trial but died prior to the one in 1998.

(1) Standard of Review Applied by the District Court.

A federal court defers to the final decision on the merits of the state court that ruled on an inmate’s habeas claims that are then brought in federal court. See 28 U.S.C. § 2254(c). We do not function as a superior state court, reviewing challenges to convictions as if we were part of the state appellate review system. Instead, our role is limited though important. The majority and I recognize the same standard under AEDPA, namely, that our review usually examines whether the state court’s decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” or an “unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). A prerequisite for that level of deference is that the claims must have been “adjudicated on the merits” in the State court. Id. Even when the claims were not adjudicated on the merits, we do not analyze them at all if they are unexhausted. Mercadel v. Cain, 179 F.3d 271, 275 (5th Cir.1999) (“exhaustion requirement is satisfied when the substance of the federal habeas claim has been fairly presented to the highest state court.”)
According to the State, the district court looked at Woodfox’s ineffective assistance of counsel claims without giving any deference to the state court. The factual foundation for that argument is footnote 15 of the Magistrate Judge’s report, the entire report then being adopted by the district court. That footnote expressed the conclusion that the state habeas court had “completely failed to address” Woodfox’s Due Process and Confrontation Clause arguments, and so had not decided those issues “on the merits” within the meaning *819 of AEDPA. This is the Magistrate Judge’s footnote:
While Woodfox asserted this claim (that his indictment should have been challenged on Due Process and Confrontation Clause grounds) in his application for post-conviction relief, he also asserted therein that his counsel should have challenged his indictment on speedy trial grounds. The state trial court, through its adoption of the State’s opposition to Woodfox’s post-conviction relief application as its reasons for denying that application, only addressed Woodfox’s speedy trial arguments and did not address his Due Process and Confrontation Clause contentions. Thus, although Woodfox “fairly presented” his Due Process and Confrontation Clause contentions for purposes of exhaustion under AEDPA, since the state court completely failed to address those arguments, this Court will review those contentions de novo, rather than under the deferential standard of review typically used where a state court has adjudicated a claim on its merits.
For this reasoning, the Magistrate Judge cited Lambert v. Beard, 2007 WL 2173390 (E.D.Pa.2007). In a parenthetical, the Magistrate Judge explained Lambert as holding that “if petitioner ‘fairly presented’ a claim to the state court (i.e., exhausted it), but the state court completely failed to address it, or refused to consider it because of an inadequate procedural bar, the federal district court reviews the claim de novo.” Id. at *8 (shown as quoted by Magistrate).
The point is significant, because if the claims were properly presented but then “not adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply,” and the claim is reviewed de novo. Henderson v. Cockrell, 333 F.3d 592, 598 (5th Cir.2003).
We are to decide claim by claim the level of scrutiny to give to a state court habeas ruling under Section 2254. That is because a federal habeas application is not to be granted “with respect to any claim” that was resolved on the merits in state court, when the “adjudication of the claim” meets the standards that are set out in the statute. 28 U.S.C. § 2254(d).
The district court considered de novo the admission of the Hezekiah Brown transcript. It is not possible to determine whether that was error without first examining how the state court considered that claim. I analyze that matter after addressing some preliminary concerns.

(2) Reading of the Transcript of Hezekiah Brown’s 197S Testimony.

The majority begins its analysis of the Confrontation Clause issue with a discussion of whether the claim was exhausted in state court. I agree that exhaustion must be considered, as there has been no explicit waiver of the point by the State. I do not similarly begin with that issue, though, because my discussion of exhaustion will occur during consideration of how the state courts resolved the use of the transcript of former testimony. Though I place the discussion somewhat later in my analysis than does the majority, simply because I find it easier to explain at that point, I agree it is a threshold question.
The State captions this Confrontation Clause issue with the assertion that defense counsel was not ineffective “in failing to make a meritless objection to Brown’s 1973 Transcript Testimony.” Hezekiah Brown died in 1996. At the 1998 trial, a state investigator sat in the witness chair, reading Brown’s testimony from 1973 as a prosecutor asked the questions from the transcript. Defense counsel did not object to the introduction of the testimony.

*820
'(a) Brown’s Testimony: Basis of State Court Ruling

A threshold question under AEDPA is whether relief was denied in state court on the merits of the federal claim. If the state court denied relief on “a state law ground that is independent of the federal question and adequate to support the judgment,” we do not consider the federal questions. Lee v. Kemna, 584 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002) (citation omitted). The state-law ground can be either substantive or procedural law. Id. There is an exception to the bar when cause for and prejudice from the default is shown, or when there has been a fundamental miscarriage of justice. Lott v. Hargett, 80 F.3d 161, 164 (5th Cir.1996). Woodfox has not argued these exceptions.
Evaluating whether a substantive or procedural determination was made by the state district court is conducted through this three-part test:
(1) what the state courts have done in similar’ cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state courts’ opinions suggest reliance upon procedural grounds rather than a determination on the merits.
Mercadel, 179 F.3d at 274 (quoting Green v. Johnson, 116 F.3d 1115, 1121 (5th Cir. 1997)). The state court that interests us most is the final one, because its ruling is the effective one. As the majority has discussed, though, there is no explanation in the two higher court rulings. So we must “ ‘look through’ to the last clear state decision on the matter.” Jackson v. Johnson, 194 F.3d 641, 651 (5th Cir.1999) (citation omitted). The only available evidence of the basis of the Louisiana Supreme Court’s decision is the state district court’s reasoning.[1]
I too quote the 21st District Court’s two relevant documents, as they are the key to what follows. One was an undated ‘Written Reasons,” which was followed by a Judgment dated October 25, 2004. The following is the entirety of the first document except for the case caption and signature:
WRITTEN REASONS
Initially, it should be noted that according to Louisiana Code of Criminal Procedure Article 930.2, Petitioner has had the burden of proving that the relief he seeks should be granted. He must prove that he is entitled to such relief. La.C.Cr.P. Art. 930.2, Official Revision Comment. Accordingly, he has the burden of proof regarding each of the claims upon which he bases his application for post-conviction relief.
In light of such burden of proof, the Court has fully considered the application, the answer and all relevant documents and has determined that Petitioner has failed to carry his burden of proof. In determining that the Petitioner’s application should be denied, the Court, moreover, adopts the State’s Response to Application for Post-Conviction Relief [dated September 30, 2004] as the written reasons for the Court’s decision.
The Judgment of October 25, 2004, has this relevant language:
JUDGMENT
The allegations presented by Petitioner have been fully addressed in the State’s Response to Application for *821 Post-Conviction Relief filed herein by the Louisiana Attorney General’s Office. A review of the record of these proceedings, as well as the answer, indicates that there is no need to hold an evidentiary hearing in the proceedings. For written reasons this day adopted and assigned, the Court finds that the allegations are without merit and the Application may be denied without the necessity of any further proceedings.
It is true that the district court stated that Woodfox had “failed to carry his burden” of proving his allegations. The majority concludes that this phrase constitutes a ruling on the merits regarding every claim. I disagree that this is a fair reading. Even though the district court did not detail its reasons, it gave us their location by adopting the State Attorney General’s explanation.
The majority finds support for its conclusion by giving a dictionary definition of the word “moreover,” a word that appears in the “Written Reasons” to preface why the court then refers to the State’s Response. I do not see “moreover” as a signal that the State’s Response contains other reasons for the ruling. Instead, the state district court explicitly said that the State’s Response has the reasons for the ruling. In my dissecting of the state court’s language, I conclude that the State’s Response contains the specific reasons for the court’s ruling, issue by issue. The “failed to carry his burden” language is a generalization which is then given meaning by the State’s Response.
As noted by the majority, the reference to Louisiana Code of Criminal Procedure Article 930.2 also does not add much to either side of the scales of whether the ruling was a procedural or a merits-based one.
Of course, the majority and this dissent are both trying to discern meaning from sentence structure and word usage in a document in which the writer may not have been trying to give such refined guidance, but it is all we have.
Consequently, I turn to the document that was adopted by the state trial judge as the reasons for the decision. I will use the shorthand of the “State’s Response” and the “Application for PCR” when referring to these important documents.
The claim is whether it was error at the 1998 trial to read to the jury the transcript of Hezekiah Brown’s 1973 testimony. The State’s Response was quite brief. “What is very interesting is that, although there is a discussion of the testimony of Hezekiah Brown included in the Statement of Facts portion of the [Application [for PCR], there is no mention of it in the Claims for relief section.” The State then explained how central Brown’s testimony was to the conviction. Without it, the State claimed, “there would probably be no case.” Two more paragraphs followed, detailing what Brown had said in 1973. The State neither analyzed the Confrontation Clause nor made other legal arguments.
I conclude that the State’s Response took the position that there were no legal arguments as to Brown’s testimony to which a legal response needed to be made. This is the argument that the state trial court will be deemed to have embraced, namely, that the issue was not properly presented. It is the only written reason the state court could have adopted. Though it is an independent state ground, it also needs to be an adequate one.

(b) Brown’s Testimony: Adequacy of Independent State Ground

A state court’s declaring procedural default cannot automatically be accepted as an adequate state ground. If the state’s procedural rule is not “firmly established *822 and regularly followed,” it will not be considered adequate. Ford v. Georgia, 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); Hughes v. Quarterman, 530 F.3d 336, 341 (5th Cir.2008). A novel state procedural rule, inconsistently applied, and about which a litigant might have no knowledge, cannot be used to block review in federal court of the constitutional claim. Ford, 498 U.S. at 424-25, 111 S.Ct. 850.
A foundation for understanding how the issue was presented is to know the facts underlying it. Factual allegations about Brown appear in Woodfox’s Application for PCR over a four-page section: Brown received favorable treatment soon after he identified Woodfox, was moved to much more comfortable housing, had the warden’s promise to seek a pardon, and otherwise was given incentives that were not known to the defense at the time of Brown’s 1973 testimony. He was pardoned in 1986, the result of continuing efforts by the former warden and other officials.
Brown’s 1973 testimony denies being promised anything. This excerpt starts with Brown’s questioning at the prison soon after the murder.
Prosecutor: Did anybody promise you anything to make you tell the truth?
Brown: Promise me anything?
Prosecutor: Did they?
Brown: No. They didn’t threaten me. I sat there a long time; I waited before I could say anything. Nobody promised me nothing.
Later, he was asked whether there were promises for his trial testimony:
Prosecutor: Hezekiah, because of your trial testimony here today, did you — let me ask you this: You stated that no one from the State promised you anything for this testimony, is that correct?
Brown: That’s right.
Prosecutor: All right, but we did tell you that you would not be put back in the same place at—
Brown: That’s right.
Prosecutor:' — -The penitentiary?
Brown: They told me that.
Prosecutor: — With Albert Woodfox?
Brown: That’s right.
With Woodfox’s second trial near, a hearing on motions was held on July 31, 1998. An assistant attorney general stated that she had asked Murray Henderson, the Angola warden from 1965 to 1975, if there were “any formal deals with any of the witnesses,” and was told that the only promise had been to provide security at the dog pen.
At the December 1998 trial, though, Henderson testified that, prior to providing his initial statement on the murder, Brown had already been moved out of the main prison to the “dog pen,” a minimum security area reserved for trustees who looked after the prison’s hunting dogs. Henderson testified in 1998 that he personally promised to seek a pardon for Brown, a pardon ultimately granted. Brown was serving a life sentence for multiple aggravated rape offenses and only recently had his death penalty vacated.
The State characterizes Henderson’s testimony as describing a promise that was made only after the trial. This is specifically what Henderson said:
Defense: And did you — did you have any — did you make any statements to Hezekiah Brown with regard to what you would do?
Henderson: I told him that we would protect him.
Defense: Excuse me, let me — let me ask my question!.] What you would do in exchange for statements about what *823 happened and in exchange for testimony?
Henderson: I told him that I would protect him.
Defense: And you told him you would protect him, send him to the dog pen?
Henderson: Do what?
Defense: Send him to the dog pen?
Henderson: Yeah. I don’t remember when I told him that, but I guess after he gave us the information.
Defense: Didn’t you also tell him that if he gave you the information and proceeded to testify for the State, that you would also promise to support a pardon application for him?
Henderson: Yeah, I told him that later, I’ve forgotten when. And shortly after that, or sometime after that, I was — I went to Tennessee as Commissioner of Corrections and I went up to the dog pen and told him that because I was leaving, didn’t mean that I wouldn’t continue to try to do something for him.
In summary, Henderson testified that he promised to move Brown to a safer area of the prison. Counsel asked whether he also promised to pursue a pardon. Henderson answered that the promise about pardon help was made “later,” meaning later than his first promise. Henderson did not testify that his promise was after the trial. Henderson said he left for Tennessee “shortly” or “sometime after” the promise was made. Henderson left Angola in 1975.
The first letter from Henderson supporting Brown’s pardon was sent a month after the 1974 trial of the last inmate indicted for Miller’s murder. Henderson wrote more letters later. A reasonable, even if not necessary, inference is a promise to help secure a pardon would not have been held in reserve, but would have been made to encourage Brown prior to his testimony. Still, defense counsel did not in 1998 get a firm answer from the former warden on when the promises were made. Henderson said he had forgotten.
To be clear, this testimony was heard by the 1998 jury. The argument is that the failure to cross-examine Brown on the promises in 1973 meant that the transcript of Brown’s testimony should never have been introduced in 1998.
In dealing with the effect of this testimony on the present Section 2254 claims, I first examine the issue of exhaustion. The State’s Response to the Application for PCR in state court admitted the facts but said that Woodfox’s attorneys never asked for relief based on this. It took fifty pages for Woodfox’s Application for PCR to move beyond factual allegations to its claims for relief. The factual recitation discusses Henderson’s testimony about Brown, saying that a “vast amount of information of previously-suppressed impeachment evidence has come to light.”
The heading in the brief for the first claims is this:
I & II. The Prosecution Presented False Evidence and Withheld from the Defense Evidence that was Favorable and Material to the Defense.
Subheading A immediately follows, asserting that the State was “obligated to provide all exculpatory evidence to the defense.” In that subsection, the caselaw was discussed that supported the principles asserted in the heading and subheading, without relating the arguments to the facts of his case. Most relevant to Brown’s testimony, the section analyzed precedents that require the prosecution to disclose any agreement it has entered regarding a witness’s criminal exposure. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 *824 L.Ed.2d 1217 (1959). The Application for PCR also discussed the seminal case requiring the prosecution to turn over exculpatory information, namely, Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
In all that discussion, Hezekiah Brown was never mentioned, and neither was anyone else. There was no effort to join the law to the facts of this case. Brown was not the focus of any later section of the pleading.
In summary, in the Application for PCR, Brown was clearly a principal concern in its first fifty pages. Then, in the first section of the claims for relief, legal principles relevant to the promises to Brown are analyzed. Subsection A appears intended to discuss the alleged defects in Brown’s 1973 testimony and its introduction in 1998. The caselaw, particularly Napue and Giglio, has little relevance to anyone else. However, the State’s Response is correct that no relief specifically identifying Brown was requested. I agree with the majority that this Application for PCR presented no coherent argument on Confrontation.
The state district court’s response to this filing met all three components of the Mercadel test for whether a court ruled on a state procedural ground. That ground was failure to argue the claim regarding Brown in the Application for PCR. I realize that the majority has looked just as carefully at the same materials and found this clearly to have been a merits-based ruling. The points of departure for our rather disparate decision are what to make of the reference in the “Written Reasons” to Woodfox’s not carrying his burden of proof, to the incorporation of the State’s Response, and to the actual arguments made by the State in that Response. I have set out my analysis of those already.
Because Woodfox’s Application for PCR was “held” to have insufficiently presented the claim regarding Brown, the adequacy of such a ruling needs to be determined. I look for a state rule that describes an applicant’s obligations. I find there must be a “statement of the grounds upon which relief is sought, specifying with reasonable particularity the factual basis for such relief.” La.Code Crim. Proc. Ann. art. 926 B(3). The final section of that article states this: “Inexcusable failure of the petitioner to comply with the provisions of this Article may be a basis for dismissal of his application.” Id. § 926 E.
Woodfox’s lengthy Application for PCR was part petition and part brief. The State’s Response was also in . the form of a brief as well as an answer. There is no argument that this was procedurally improper under Louisiana law.
I find no presentation requirements set out in the Louisiana Code of Criminal Procedure for post-conviction written legal arguments in district court. Louisiana caselaw reveals that some flexibility is permitted, particularly when the presentation is pro se (this one was not). For example, an inmate filed an application that neither assigned nor briefed any errors; it was dismissed after the district court granted an extension of time to correct. State v. Anderson, 561 So.2d 1391, 1392 (La.App. 5 Cir.1990). The Louisiana Supreme Court has held that a district court should exercise discretion when deciding whether, in the interests of justice, an applicant for post conviction relief should be allowed to amend a timely filed but poorly drafted application. State ex rel. Glover v. State, 660 So.2d 1189, 1197 n. 8 (La.1995), abrogated on other grounds, State ex rel. Olivieri v. State, 779 So.2d 735, 742 (La.2001). Only “[ijnexcusable failure” to comply with the *825 provisions should cause dismissal. La. Code Crim. Proc. Ann. art. 926 E.
The particular defect argued by the State, valid as far as it went, would have earned a bad grade in legal drafting but hardly prevented the substance of the claim from being understood. I am uncertain whether the shortcomings in the Application for PCR would even be considered a failure under article 926 to state the “grounds.” If so, before the state district court dismissed for the failure in Wood-fox’s pleading to tie the facts regarding Brown to the law of Brady and Giglio, some consideration was supposed to be given to whether, in the interests of justice, allowing an amendment would be justified to remove ambiguity in the legal presentation.[2] Finally, nothing suggests that this sloppiness would be thought “inexcusable failure” of compliance.
In some state court precedents, there was evidence available of a state court practice contrary to the one under review. For example, we rejected a Texas procedural ruling that an objection was inadequate at trial to preserve an issue. Rosales v. Dretke, 444 F.3d 703, 708 (5th Cir.2006). We found that the Texas Court of Criminal Appeals often showed more tolerance for the inartful objections made at trials held before the relevant federal constitutional issues under Batson had been identified. Id. (discussing Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)). A more recent decision found that a state procedural rule barring a claim was “strictly or regularly applied evenhandedly” to most claims. Turner v. Quarterman, 481 F.3d 292, 301 (5th Cir.2007).
Woodfox has the burden to show that the procedural rule is not “regularly applied, ... or that the rule was exorbitantly applied under the circumstances of the case.” Wright v. Quarterman, 470 F.3d 581, 586 (5th Cir.2006) (internal quotations and citations omitted). There was no discovered practice of zero-tolerance for post-conviction application inadequacy. Ford, 498 U.S. at 425, 111 S.Ct. 850. To the contrary, caselaw and the Louisiana Code of Criminal Procedure are fairly forgiving. The burden was carried to show that the state courts did not apply a firmly established, regularly applied rule.
Though the state ground was inadequate, the issue still had to be exhausted in state court. Mercadel, 179 F.3d at 275. In Mercadel, we concluded that the inmate’s improper filing in the state Supreme Court as opposed to a state district court was the procedural reason for the dismissal; it was also the reason the claims were unexhausted. Id.
I do not find that same difficulty here. There must be a fair presentation of the claim, including presenting it in a “procedurally correct manner.” Deters v. Collins, 985 F.2d 789, 795 (5th Cir.1993). Thwarting the state procedures by not adequately presenting an issue so that the state courts will consider it constitutes a failure to exhaust. Mercadel, 179 F.3d at 275.
Among the minimum requirements of a fair presentation is that the inmate be clear that he is making a claim under the federal constitution and not solely under state law. Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (inmate argued in state court that an erroneous evidentiary ruling was a “miscarriage of justice”; not until federal court did he make a claim of a Due Pro *826 cess violation). We have used “substantial equivalent” as the degree of similarity-needed between the state and federal claims. Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir.1998). The purpose being served is that a state court must be given the “opportunity to pass upon and correct” the alleged errors in the conviction. Duncan, 513 U.S. at 365, 115 S.Ct. 887 (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)).
It is not necessary to cite “book and verse on the federal constitution,” but the substance must be presented. Picard, 404 U.S. at 278, 92 S.Ct. 509 (quotation omitted). We have referred to a need to present the “same facts and legal theory” before we will find an issue exhausted in state court. Ruiz v. Quarterman, 460 F.3d 638, 643 (5th Cir.2006). The legal theory presented in state court must not be “distinct” from the one presented in federal court. Id.
Applying those principles, I conclude that Woodfox clearly was making a federal constitutional claim. An application in state court for post-conviction relief, perfect upon its filing in its research, reasoning, and presentation, is not necessary. When the application is dismissed prematurely on inadequate state grounds, the processes of the adversary system that can lead to amendments of pleadings and arguments are short-circuited. It would only be speculation as to what would have happened in state court, including how the presentation of the legal arguments might have developed. Speculation serves no analytical purpose. Because Woodfox’s case should have been allowed to proceed further, I would not now fault him for what he had not yet argued before the dismissal. The only basis before us for the dismissal was the one adopted by the district court, then approved by the reviewing courts. That basis was inadequate.
Because the state courts did not reach the merits, because they relied on an inadequate state ground, and because the issues were fairly presented, I turn to the merits. Powell v. Quarterman, 536 F.3d 325, 343 (5th Cir.2008).

(c) Analysis of Legal Issues Regarding Brown’s Testimony

The majority analyzes the merits through AEDPA deference. However, for AEDPA’s standards to apply to our merits analysis, the claims must have been adjudicated on the merits. 28 U.S.C. § 2254(d)(1); Henderson, 333 F.3d at 598. Of course, the majority says they were. Because I have concluded that the merits were never reached and an inadequate procedural ground was the basis for denial of relief, I examine the claim under preAEDPA standards. Henderson, 333 F.3d at 598. “The pre-AEDPA standards do not require a federal court to defer to the state court’s legal conclusions.” Kunkle v. Dretke, 352 F.3d 980, 985 (5th Cir.2003). On collateral review, we apply the law at the time the conviction became final, with certain narrow exceptions. Teague v. Lane, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). For purposes of retroactivity analysis, this date is November 13, 2001, when the Supreme Court denied certiorari to review Woodfox’s direct appeal. See Beard v. Banks, 542 U.S. 406, 411, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004).
The first claim raised by Woodfox in his amended Section 2254 application was a Confrontation Clause and Due Process violation resulting from the use of Brown’s testimony in the 1998 trial. Both the federal and the state rules of evidence regarding the use of prior sworn testimony were cited. The violation was said to arise from *827 the absence of an adequate opportunity to cross-examine Brown on the key items of impeachment. Woodfox cited Confrontation Clause jurisprudence that developed after his conviction became final. See Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Also woven into the argument was the issue of the State’s failing to disclose the exculpatory and impeachment material. See Brady, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. The claim is properly seen as a hybrid of failure to disclose and, on that basis, an inadequate opportunity to cross-examine.
Woodfox’s argument is built on the foundation that his multiple 1998 trial counsel were ineffective in failing to make the proper objections to reading Brown’s 1973 testimony into the record. A claim seeking relief for ineffective assistance of counsel requires showing both that counsel performed deficiently, and that the deficiencies were prejudicial to the defense. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice means “that there is at least ‘a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ ” Neal v. Puckett, 286 F.3d 230, 241 (5th Cir.2002) (en banc) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052).
Crawford v. Washington, cited by Woodfox, was decided after Woodfox’s conviction became final and is not to be applied retroactively. Whorton v. Bockting, 549 U.S. 406, 421, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007). Instead, the relevant Supreme Court precedent is Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Under Roberts, an out-of-court declarant’s testimony was admissible provided it either fell under a “firmly rooted hearsay exception” or bore other “adequate indicia of reliability.” Id. at 66, 100 S.Ct. 2531; United States v. Avants, 367 F.3d 433, 445 (5th Cir.2004). The parties do not dispute that a firmly rooted hearsay exception existed for sworn testimony given at an earlier proceeding. The following is the language from the state evidentiary rule describing the former testimony whose admission was firmly rooted:
Testimony given as a witness at another hearing of the same or a different proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a party with a similar interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
La.Code Evid. Ann. art. 804(B)(1); Avants, 367 F.3d at 445 (holding that the Fed.R.Evid. 804(b)(1) exception, equivalent to La.Code Evid. Ann. art. 804(B)(1), was a firmly rooted hearsay exception).
The district court found that Woodfox’s first trial counsel lacked the “opportunity” to make a sufficient cross-examination “regarding the prospect of a pardon and incentives” for his cooperation. This was because the state had “suppressed” information regarding those issues at the time of the first trial. While no court has ever found a Brady violation with respect to the incentives offered Brown and others, a commissioner reviewing a state habeas claim in 2006 found such a violation and recommended vacating the conviction of another inmate convicted for the murder. By a supplement to the record, the State filed the order of the 19th Louisiana District Court that rejected the recommendation and denied relief in 2007.[3]
The Roberts test is disjunctive; a search for particularized “indicia of reliability” is *828 only required when a statement does not fall under a firmly rooted hearsay exception. Fratta v. Quarterman, 536 F.3d 485, 499-500 (5th Cir.2008). This controversy concerns the firmly rooted exception for prior testimony, and it is that principle I explore.
This court once “declined to decide whether ineffective or minimal examination of the witness” was sufficient to bar admission of a record of the prior testimony. Magouirk v. Warden, Winn Corr. Ctr., 237 F.3d 549, 554 (5th Cir.2001). We held that if trial court interference prevented any cross-examination, testimony from a prior court proceeding was inadmissible due to the absence of an opportunity for questioning the witness. Id.
Among the authorities on which we relied was one in which at a preliminary hearing, some cross-examination of the later unavailable witness had occurred. Meehler v. Procunier, 754 F.2d 1294, 1297-98 (5th Cir.1985). Even though defense counsel in the earlier proceeding had not yet seen the ballistics and autopsy reports, we held that the cross-examination “was neither de minimis nor ineffective.” Id. at 1298. The unavailable witness, Frances Wise, was the only eyewitness to the murder. She notified authorities that she was leaving the state, and her testimony was preserved at a hearing in which cross-examination by defense counsel occurred. That testimony was then introduced at the trial over a defense objection. The autopsy and ballistics report had not yet been provided to counsel at the time of the hearing.
Chief Judge Clark, writing for the court, identified the following components of meaningful cross-examination:
Wise’s testimony, like that at question in Roberts, was tested “with the equivalent of significant cross-examination.” 448 U.S. at 70, 100 S.Ct. at 2541. As in Roberts, the questioning of Wise clearly partook of cross-examination as a matter of form, replete with leading questions, “the principal tool and hallmark of cross-examination.” Id. at 70-71, 100 S.Ct. at 2541. In addition, Mechler’s counsel’s questioning comported with the principal purpose of cross-examination: “to challenge whether the declarant was sincerely telling what [s]he believed to be the truth, whether the declarant accurately perceived and remembered the matter [s]he related, and whether the declarant’s intended meaning is adequately conveyed by the language [s]he employed.” Id. at 71, 100 S.Ct. at 2541.

Id.

Questioning an eyewitness about ballistics results and an autopsy is a test of the plausibility of the story. The witness might become less certain as a result, but it is the kind of doubt that jurors themselves can grasp with some equivalence. If the witness has no known bias, her sincerity is not the question. On the other hand, questioning a man who was serving a life sentence about what specific promises might have been offered him for a pardon is a direct challenge to his honesty, something only the witness can answer. How believably he answers can be critical. The Mechler reasoning is valid and supportive of Woodfox’s claim because of this distinction.
The opportunity to cross-examine must be a meaningful one. “In some cases, however, because of particular circumstances, the opportunity to cross-examine at the earlier proceeding may not have resulted in a test of the reliability of the statement.” 5 Jack B. Weinstein & Margaret A. Berger, Weinstein’s Federal Evidence § 804.04[3][b] (Joseph M. McLaughlin ed., 2d ed.2009). Among the citations for that statement was a decision in which the earlier cross-examination was *829 of a witness whose violation of the sequestration rule was not known until after his testimony. United States v. Monaco, 702 F.2d 860, 866 (11th Cir.1983).[4] The court found no evidence that the witness’s improper conversations with two other witnesses led to a tailoring of his testimony to match theirs. Id. at 868. The court concluded that because the violation did not relate to the substance of his testimony, it did not affect the admissibility of the prior testimony. Id.
These prior decisions properly isolate the narrow concern relevant in the present case. Each of those decisions stopped short of opining on a situation in which the unknown impeachment evidence that could not be used in the earlier cross-examination would affect the core of that prior testimony. That could be, as here, because of powerful incentives at work on the witness, or for other reasons. It is necessary to go a step further than any of these precedents.
As mentioned, the claim has been presented as a hybrid of Brady and Giglio principles. I find no evidence that the prosecution in 1973 or even in mid-1998 knew what the warden said he promised. Even so, the intent of the State to withhold evidence is not key. In Giglio, the Supreme Court acknowledged the uncertainties about whether the Government had been aware of the promises made to a key witness against Giglio. The Court found the doubts to be irrelevant due to the importance of the witness.
Here the Government’s case depended almost entirely on Taliento’s testimony; without it there could have been no indictment and no evidence to carry the ease to the jury. Taliento’s credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.
Giglio, 405 U.S. at 154-55, 92 S.Ct. 763.
It seems to me that these are the key facts. (1) At least as early as the State’s Response to the Application for PCR, the State had acknowledged that Brown was the indispensable witness to its case. (2) Yet unknown at the time, this inmate serving a life sentence, who only recently had been freed from a death sentence, was allegedly promised the best efforts of the warden to get him pardoned.
The imprecision in how the former warden in 1998 expressed the date of the promise has already been noted. I have already discussed that this issue properly received de novo review in the District Court, including as to the facts. We are to examine the District Court’s finding on this factual issue for clear error. Lefevre v. Cain, 586 F.3d 349, 352-53 (5th Cir. 2009). It was a reasonable finding by the District Court that such a promise would have been offered as a pre-trial carrot and not as post-trial lagniappe — a word appropriately originating in Louisiana to describe a gratuity. 8 Oxford English Dictionary 590 (2d ed.1989). I therefore find we should sustain the finding that at the time Brown testified, he did so with a promise of the warden’s help to get a pardon.
Of course, the 1998 jury knew about the promise from the warden. That is not enough. Cross-examination is not replicated when the witness never has to respond to the impeaching evidence. See United States v. Garcia, 530 F.3d 348, 353 (5th Cir.2008) (“Only through live cross-examination can the fact-finder observe *830 the demeanor of a witness, and assess his credibility.”) (quoting Int’l Shortstop Inc. v. Rally’s Inc., 939 F.2d 1257, 1265-66 (5th Cir.1991)). There would be no need to determine whether prior cross-examination was “meaningful” if it were always sufficient that the unknown subjects for questioning at the first trial were explained at the second.[5]
I have not discussed any precedent directly on point, as I have found none. The search for precedents far from its jurisdiction can deflect a court from making a careful analysis of a somewhat novel issue. Nonetheless, I find an opinion reviewing a quite similar set of facts from the Supreme Court of Pennsylvania. Commonwealth v. Bazemore, 531 Pa. 582, 614 A.2d 684 (1992). Melvin Hauser was the state’s only witness at a preliminary hearing. It became known later that Hauser had made a prior inconsistent statement to police, had a criminal record, and that the prosecutor was contemplating charges against him concerning the same attempted burglary for which Bazemore was being prosecuted. None of these facts were known to defense counsel when cross-examining Hauser at the preliminary hearing.
At trial, Hauser invoked his Fifth Amendment rights. The Pennsylvania Supreme Court reasoned that Bazemore had not been given a “fair opportunity” to cross-examine the witness earlier.
The real basis for the admission of testimony given by a witness at a former trial is to prevent the miscarriage of justice where the circumstances of the case have made it unreasonable and unfair to exclude the testimony. It naturally follows that testimony from the former trial should not be admitted if to do so would result in a miscarriage of justice.
Id. at 686, 614 A.2d 684 (quoting 29 Am. Jur.2d Evidence § 738).
The Pennsylvania court also said that even though cross-examination had occurred, the fact that counsel had not known of the significant impeachment evidence kept the witness’s recollections from being “fully tested” by the defense. Id. at 687, 614 A.2d 684. The court did not find the harm removed by allowing other witnesses at trial to testify about the inconsistent statement and other evidence. Their testimony would not be a complete picture of the responses the witness might otherwise have made when faced directly with impeachment evidence.
The mere opportunity to impeach an unavailable witness indirectly is obviously not the same thing as the opportunity to cross-examine (and impeach) the witness directly. Had the defense in this case had the opportunity to confront Hauser directly and to cross-examine him directly with the benefit of the vital withheld information, Hauser may have recanted his prior testimony or he may have made other responsive statements or reactions which would have strengthened appellant’s defense by casting doubt upon Hauser’s credibility or his prior inconsistent account of the circumstances in question. The introduction of such impeaching information indirectly is clearly an inadequate substitute for a *831 full and fair opportunity to examine the witness himself or herself.
Id. at 688 n. 4. See also, 4 Handbook of Federal Evidence 804:1; 2 Wharton’s Criminal Evidence 6:10.40 (15th ed.) (citing Bazemore for these points).
The extra step for Woodfox’s argument is that defense counsel did not object in 1998. Ineffective assistance of counsel analysis thus applies. Because the indispensable Hezekiah Brown’s testimony from the 1973 trial could not be admitted in 1998, it was ineffective assistance of counsel for Woodfox’s attorneys not to have objected based on Ohio v. Roberts. The precise error was not settled law, but counsel’s failure to make a strenuous effort to raise these principles and seek exclusion fell below minimum competence. Prejudice from that failure is clear, as excluding the testimony would have likely ended the case.
This determination requires that the writ of habeas corpus be granted, vacating the state court judgment of conviction. The district court was correct when it did exactly that.
I would affirm the grant of relief.

. There is no suggestion Woodfox procedurally stumbled as he sought further review of the state district court's decision, thereby creating a new basis for denying relief.

. Of course, I have only imputed this reasoning to each state court. There is some artificiality to this process for understanding the state court’s application of its procedural rules. Still, we are required to proceed this way.

. Wallace v. State, No. 10-73-6820 (19th Jud. Dist., Oct. 9, 2007); writ den'd, 2007 KW 2525 (La.App. 1st Cir.2008) (one judge dissenting on Brady issue).

. Though the decision does not become precedential for this reason, I note that all three judges deciding Monaco were on this court prior to the 1981 split of the Fifth Circuit.

. The Supreme Court emphasized that the Confrontation Clause is founded on the need for the accused to be able to face the accuser when the accusations are being made to a jury. The Court gave a "notorious” example of why that is crucial by describing the 1603 trial of Sir Walter Raleigh for treason. Crawford v. Washington, 541 U.S. 36, 44, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Introduced into evidence was a letter and prior testimony of one of his alleged accomplices. Raleigh thought the witness would recant if called to face him, but the judges refused. Id.